■ In the Matter of Natasha W., Respondent, v New York State Office of Children and Family Services et al., Appellants, and New York City Administration for Children's Services, Respondent. [42 NYS3d 126]—

Order and judgment (one paper), Supreme Court, New York County (Alice Schlesinger, J.), entered February 18, 2015, which granted the petition seeking to, among other things, amend and seal an indicated report of child maltreatment by petitioner, to the extent of annulling the report and the determination of an administrative law judge (ALJ), dated February 11, 2014, which had denied petitioner's request, and remanding the matter to respondents for further proceedings, affirmed, without costs.

Respondent New York City Administration for Children's Services (ACS) explicitly concluded, after a two-month long investigation, that petitioner's child was not "likely to be in immediate or impending danger of serious harm." Nonetheless, the ALJ determined that the child is in imminent danger. Accordingly, and as more fully set forth below, the motion court correctly found that the ALJ's decision was based on an error of law in that it misapplied the legal standard, lacked a reason-

able basis, and was made without regard to the facts (CPLR 7803 [3]; *see also Matter of Peckham v Calogero*, 12 NY3d 424, 431 [2009]). Moreover, the motion court correctly found that the ALJ failed to consider the 10 factors set forth in the Guidelines for Determining Whether Indicated Instances of Child Abuse and Maltreatment Are Relevant and Reasonably Related to Employment or Licensure (the guidelines), which is published by respondent New York State Office of Child and Family Services (OCFS).

Before addressing the legal issues, it is important to clarify exactly what is at stake on this appeal. No one disagrees that what petitioner did was foolish and demonstrated poor judgment. However, notwithstanding that, no city or state agency has contended that petitioner's son should be removed from her, or that she cannot safely care for him, or that her care of him should be supervised by any court or agency. What is at issue here is solely whether her name should be maintained on a list which would make it difficult for her to obtain a job in childcare, which is her chosen profession.

The essential underlying facts are undisputed. At the time of the relevant events, petitioner, then 25, and her five-year-old son lived with petitioner's parents. Petitioner had an associate's degree in early childhood education, and was planning to obtain a bachelor's degree and pursue a career in that field. On December 30, 2012, petitioner and her son entered Bloomingdale's department store. After they emerged from a fitting room, a store detective detained petitioner, and found a coat hidden under her own coat and several concealed cell phone cases. In addition, he found two coats under her son's clothing, and determined that the child was wearing a pair of boots for which petitioner had not paid. Petitioner immediately phoned her family and arranged for her sister to pick her child up.[1] Petitioner was arrested for shoplifting and later pleaded guilty to disorderly conduct, a violation, which was later sealed. She has no criminal record from this incident, or before.

For the next two months, ACS conducted an investigation of a report of child maltreatment to the Statewide Central Register of Child Abuse and Maltreatment (SCR) based on these events. The store detective reported that, during the incident, the child was "not at all distraught," and was playing video games and "interacting normally." After visits to

---

1. Respondents-appellants' brief states that the police took petitioner and the child to the precinct. However, the only relevant evidence in the record shows that the child's aunt picked him up at the store and he was not present when his mother was arrested.

petitioner's home, a Child Protective Specialist (CPS) concluded that the child did not need medical or mental health treatment and that the petitioner was not a danger to the child. The investigation established that neither petitioner nor her family had any history with ACS, and that petitioner's mother, father and sisters were all surprised by her actions on December 30, and had never known her to have done anything similar in the past, consistent with petitioner having no prior criminal history. Petitioner's family members also reported having no concerns for her ability to care for her son, and uniformly stated that he was well cared for. Similarly, the child's school social worker confirmed that she had never had any reason for concern, and the child had nearly perfect school attendance. Petitioner advised the investigator that she did not use physical discipline, but disciplined her son by giving him "timeouts" and taking away games. The ACS investigator observed that the child had no marks or other signs of physical harm.

The child, interviewed on at least three occasions, was "clean, healthy looking and cared for," "calm," and consistently stated that he felt safe and happy and was not afraid of anyone at home. When asked, he stated that the police took his mother to jail because she stole, and that she had not told him to steal. Although petitioner declined to discuss the details of the events of December 30 on the advice of her attorney, she told the ACS investigator that she had "learned her lesson."

ACS's investigation summary concluded that "there is no child[ ] likely to be in immediate or impending danger of serious harm," the "Final Risk Rating" was "Low," "No Safety Factors were identified at this time," and "No Safety Plan/ Controlling Interventions are necessary at this time." Consistent with its findings, ACS did not commence a neglect proceeding against petitioner, or in any other way seek the assistance of a court with regard to petitioner's child. Nonetheless, the final progress narrative states: "The investigation is approved for closing *indicated*. Child reported that his mother was arrested with him in her care due to her stealing. CPS is to provide mom with information to community based services such as parenting to teach her appropriate disciplinary method as well as decision making" (emphasis added). Despite this conclusion, the record does not show that ACS saw any need to, or did, take any steps to ensure that petitioner took a parenting class or engaged in any other community based services.

Once petitioner was advised that OCFS determined, as stated above, that the report against her was "indicated,"

petitioner promptly requested that SCR amend the report to "unfounded." OCFS denied the request, and scheduled a hearing.

At the hearing on October 25, 2013, the ALJ received into evidence only the ACS investigation notes and summary, and the New York State Criminal Record search for petitioner dated October 23, 2013, which showed that petitioner had no criminal history as of that date. No witnesses testified. Counsel for the parties made opening and closing statements, and statements on the record denominated "direct testimony . . . in narrative form" for their respective clients.

The ALJ issued a decision dated February 11, 2014 (the decision). The ALJ determined that petitioner had "maltreated" her child and therefore denied her request that the "indicated" report against her be amended. Although he did not find any evidence in the record that petitioner's child had been harmed, he concluded that her "action creates an imminent risk to the child's emotional condition in that [the child] will not control his impulses and will proceed from accompanying his mother in shoplifting to doing it on his own." The decision also found that petitioner's actions were relevant and reasonably related to childcare employment, adoption and foster care because petitioner had failed to present "evidence of remedial steps which would prevent this behavior from reoccuring." This roughly corresponds to guidelines factor 8, information regarding rehabilitation, but the decision does not address any of the other nine guidelines factors.

Petitioner sought judicial review of the decision pursuant to CPLR 7803 (3), which authorizes the court to determine "whether a determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion" (CPLR 7803 [3]). The motion court granted the petition, and held that (1) the ALJ made errors of law because the undisputed facts do not, as a matter of law, show that the petitioner put the child in "imminent danger," which is the requisite standard for a finding of maltreatment; and (2) the ALJ erred by failing to consider the 10 guideline factors for determining whether the acts giving rise to the report were relevant and reasonably related to employment in childcare, provision of foster care, or adoption.

Under New York's child protective scheme, a report of suspected child abuse or neglect will be marked "indicated" if the local agency determines after investigation that there is "some credible evidence of the alleged abuse or maltreatment" (Social Services Law § 412 [7]). All childcare agencies and other

agencies licensed by the state to provide certain services to children are required to inquire whether applicants for employment or to become foster or adoptive parents are subjects of indicated reports (Social Services Law § 424-a). An agency may choose to hire or approve persons on the list of those with indicated reports, but if it does, the agency must "maintain a written record, as part of the application file or employment record, of the specific reasons why such person was determined to be appropriate" for approval (Social Services Law § 424-a [2] [a]). The names of subjects of indicated reports remain on the list until 10 years after the youngest child referred to in the report turns 18, unless earlier expunged (Social Services Law § 422 [6]).

If the subject of an indicated report timely requests that SCR amend the report, SCR must consider whether there is sufficient evidence that the subject committed child maltreatment or abuse, and, if so, must also determine whether, based on the guidelines, the acts of maltreatment or abuse are "relevant and reasonably related" to, among other things, certain employment involving children, or approval as a foster or adoptive parent (Social Services Law § 422 [8] [a] [ii]). If the request to amend the report is denied, the person is entitled to a fair hearing (Social Services Law § 422 [8] [a] [v]; 18 NYCRR 434.3 [a] [2]).

Until 2008, the Social Services Law provided that the investigating child protective agency only had to show that there was "some credible evidence" of maltreatment or abuse, at both the SCR administrative review and at any subsequent fair hearing. However, in 1994 and 1996, respectively, the Second Circuit and the New York State Court of Appeals held that the use of the "some credible evidence" standard violates the Due Process Clause of the US Constitution because the resulting impediment to potential future employment, licensure as foster parents, or approval as adoptive parents as a consequence of an indicated report implicates constitutionally protected liberty interests (*Matter of Lee TT. v Dowling*, 87 NY2d 699 [1996]; *Valmonte v Bane*, 18 F3d 992 [2d Cir 1994]). As a result, the Social Services Law was amended in 2008 to require that the state prove child maltreatment or abuse at the administrative level by a fair preponderance of the evidence (Social Services Law § 422 [8] [a] [i], [ii]; [b] [ii]; [c] [ii]; *see also* L 2008, ch 323, §§ 10, 11; 18 NYCRR 434.3).[2] Only if the agency makes that determination may it go on to consider whether the

---

**2.** The statutory standard for the initial determination that a report is indicated was not amended, so a person who does not request a review does

person is unsuited for employment in the childcare field (Social Services Law § 422 [8] [c] [ii]).

The fair preponderance of the evidence standard requires the finder of fact to weigh conflicting evidence, and is intended to protect against rulings based on " 'the subjective values of' the factfinder," a risk that is particularly high in cases where child abuse and neglect are alleged (*Valmonte*, 18 F3d at 1004, quoting *Santosky v Kramer*, 455 US 745, 762 [1982]).

The statutory definition of a maltreated child, as relevant to this matter, includes a child under 18 "whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his parent or other person legally responsible for his care to exercise a minimum degree of care . . . in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or a substantial risk thereof, including the infliction of excessive corporal punishment; or by misusing a drug or drugs; or by misusing alcoholic beverages to the extent that he loses self-control of his actions; or by any other acts of a similarly serious nature *requiring the aid of the court*" (18 NYCRR 432.1 [b] [1] [ii] [emphasis added]; *see also* Family Ct Act § 1012 [f] [i] [B] [supplying an identical definition of the term "neglected child"]).

Consistent with this, the Court of Appeals held in *Nicholson v Scoppetta* (3 NY3d 357, 368 [2004]) that a finding of neglect requires a showing, by a preponderance of the evidence, that (1) a child's "physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired," and (2) "the actual or threatened harm to the child is a consequence of the failure of the parent or caretaker to exercise a minimum degree of care in providing the child with proper supervision or guardianship." This standard is intended to "ensure[ ] that the [agency] . . . will focus on serious harm or potential harm to the child, not just on what might be deemed undesirable parental behavior" (*id.* at 369; *see also Matter of Parker v Carrión*, 80 AD3d 458, 459 [1st Dept 2011] [parent who intended to hit child on her behind, but instead hit her on the face with a belt, entitled to amendment of report finding maltreatment where there was no evidence the child required medical treatment or that the parent used excessive corporal punishment]).

Under article 10 of the Family Court Act, " '[i]mpairment of emotional health' and 'impairment of mental or emotional

not have the benefit of the higher standard (*compare* Social Services Law § 412 [7], *and* Social Services Law § 422 [8] [a] [i], [ii]; [c] [ii]).

condition' includes a state of substantially diminished psychological or intellectual functioning in relation to, but not limited to, such factors as failure to thrive, control of aggressive or self-destructive impulses, ability to think and reason, or acting out or misbehavior, including incorrigibility, ungovernability or habitual truancy; provided, however, that such impairment must be clearly attributable to the unwillingness or inability of the respondent to exercise a minimum degree of care toward the child" (Family Ct Act § 1012 [h]). A finding of imminent risk of impairment "must be near or impending, not merely possible" (*Nicholson v Scoppetta*, 3 NY3d at 369), and, particularly when based on a single incident, must "make the necessary causative connection to all the surrounding circumstances that may or may not produce impairment" (*Matter of Nassau County Dept. of Social Servs. v Denise J.*, 87 NY2d 73, 79 [1995] [positive toxicology for controlled substance in newborn infant and mother generally not sufficient to prove imminent danger of impairment]; *see also Nicholson*, 3 NY3d at 369).

In this case, there was no evidence before the ALJ that the child suffered any injury or required any treatment as a result of petitioner's conduct, and no evidence that petitioner had ever engaged in the behavior at issue at any other time. Instead, the only evidence at the hearing with regard to harm to the child was the ACS finding that the child had not suffered any harm and that petitioner was not a danger to the child. Consequently, the ALJ's finding of maltreatment was not supported by a preponderance of evidence and was therefore made in violation of lawful procedure. Indeed, this Court and its sister courts have refused to find maltreatment in cases involving far more immediate harm (*see Matter of Parker v Carrión*, 80 AD3d at 458; *Matter of Sulayne G. [Sulay J.]*, 126 AD3d 791 [2d Dept 2015] [corporal punishment without evidence of physical or emotional injury and a pattern of such behavior did not constitute maltreatment]; *Matter of Senande v Carrion*, 83 AD3d 851 [2d Dept 2011] [mother who hit child on thigh with house slipper, leaving a mark, did not commit maltreatment where no evidence of lasting injury or that mother had ever done this before]).

In the absence of any evidence to support a finding that petitioner had caused actual harm to the child, the ALJ stated, "there are circumstances where a parent's behavior is so outrageous, that in and of itself, creates an imminent risk of emotional harm to the child . . . . Exploitation of a child to commit a crime, as well as teaching a child how to commit a

crime, rises to such a level of outrageous behavior . . . . The [petitioner's] action creates an imminent risk to the child's emotional condition in that [the child] will not control his impulses, and will proceed from accompanying his mother in shoplifting to doing it on his own." This is just the type of imposition of the factfinder's subjective views of parental behavior that the use of the higher evidentiary standard was intended to correct (*Valmonte*, 18 F3d at 1004; *Nicholson*, 3 NY3d at 368-369). Instead of applying the correct legal standard to determine whether there was serious potential for harm requiring the aid of a court, the ALJ substituted his conjecture that the child might commit crimes in the future, even though the record reveals that the mother had no criminal history, that the child understood that his mother was arrested because she tried to steal, and that he was, by all accounts, calm, happy, well cared for, well behaved in school and not in need of any medical or mental health intervention.

The ALJ cites *Matter of Rashard D.* (15 AD3d 209 [1st Dept 2005]) for the proposition that the child in this case was in imminent danger of physical harm due to his mother's acts. However, *Rashard D.* involved a parent who made her 12-year-old child rob a bank by handing a teller a note that said "GIVE ME $30,000 OR I WILL SHOOT YOU!!!" (*id.* at 210). Here, there was no evidence that petitioner's child was ever in any physical danger. No mental health expert testified as to the impairment, or imminent risk of impairment, of the child's emotional or mental condition as a result of petitioner's behavior, and ACS had made an explicit finding to the contrary.

These facts also distinguish this case from the cases relied upon by the ALJ for the proposition that certain parental behaviors create imminent risk of emotional harm. In each of those cases, the court relied on mental health experts' findings in determining that the subject child was emotionally harmed by a parent's behavior (*Matter of Christina LL.*, 233 AD2d 705 [3d Dept 1996], *lv denied* 89 NY2d 812 [1997]; *Matter of Jessica G.*, 151 Misc 2d 694 [Fam Ct, Richmond County 1991]).[3]

Similarly, *Matter of Bernthon v Mattioli* (34 AD3d 1165 [3d

---

3. Use of expert testimony is available at the fair hearing stage. The Child Protective Services Administrative Hearing Procedures provide that "[p]roof of the impairment of emotional health or impairment of mental or emotional condition as a result of the unwillingness or inability of the appellant to exercise a minimum degree of care toward a child may include competent opinion or expert testimony and may include proof that such impairment lessened during a period when the child was in the care, custody or supervision of a person or agency other than the appellant" (18 NYCRR 434.10 [e]).

Dept 2006], *appeal withdrawn* 8 NY3d 918 [2007]), cited by the dissent and by respondents for the proposition that using a child to facilitate shoplifting constitutes maltreatment as a matter of law, does not so hold. In that case, the only issue on appeal was the admissibility of hearsay statements at a custody modification trial. The Appellate Division, Third Department held that the hearsay exception under Family Court Act § 1046 (a) (vi) applies in custody proceedings involving allegations of abuse or neglect (*id.* at 1165). Indeed, the Court in *Bernthon* found only that the child's statements about having been used to aid her mother's shoplifting "would support a finding of neglect" (*id.* at 1166), but no neglect proceeding was brought, the issue of neglect was not tried, and no finding of neglect was made, since the applicable standard was whether a change of circumstances justifying modification had occurred, and the custody arrangement that would best serve the child's interest.

The legal questions at stake in *Bernthon* are very different than the question in this case: whether the ALJ applied the proper legal standard in determining whether respondents met their burden at the hearing to show imminent harm to the child justifying government intrusion into petitioner's private life. Furthermore, the facts of *Bernthon* are distinguishable from the instant matter. In *Bernthon*, the mother had a "history of petit larceny," and had violated a court order by discussing the litigation with her daughter and conveying that she would never see her mother again if she spoke to child protective service workers (34 AD3d at 1166). Here, petitioner had no criminal history, her family members interviewed all agreed that her behavior was out of character, petitioner told the ACS investigator that she had "learned her lesson," the child was reportedly "not at all distraught," and ACS did not find the child to be in danger.

Similarly, the cases cited by respondents for the proposition that shoplifting in and of itself creates a risk of violence and physical harm to the child are also distinguishable. In the first instance, each is an excessive sentence appeal, having nothing to do with a finding of child maltreatment. In *People v Jones* (199 AD2d 648 [3d Dept 1993], *lv denied* 83 NY2d 854 [1994]), the defendant threatened to use a baseball bat as a weapon, and choked the property owner's son, whom the defendant encountered while attempting to burglarize the property. *People v Callahan* (89 AD2d 517, 518 [1st Dept 1982]) involved a robbery arising out of a "drunken escapade," in which the complaining witness sustained injuries. There was no evidence that petitioner in this case intended to or did commit violence.

Rather, ACS's investigation notes indicate that she was cooperative when stopped by the store detective.

The cases relied on by respondents involving unreasonable exposure of children to risk by other behavior are similarly inapposite, since all involve far more extreme parental behavior resulting in obvious danger. In *Matter of Rosemary V. (Jorge V.)* (103 AD3d 484 [1st Dept 2013]), a father left his children home alone at night while he engaged in a drug transaction, as a result of which the children locked themselves out of the apartment and went to a stranger's home. In *Matter of Febles v Dutchess County Dept. of Social Servs. Child Protective Servs.* (68 AD3d 993 [2d Dept 2009]), a mother left her seven-year-old child alone in a running car for 20 minutes. In *Matter of Pedro C. (Josephine B.)* (1 AD3d 267 [1st Dept 2003]), a mother was intoxicated on the street at night with her two-year-old child.

Finally, the ALJ's determination that petitioner's actions were reasonably related to a position in childcare, the field of study petitioner is pursuing, was not rational. The legal standards for determining whether a child is maltreated (18 NYCRR 432.1 [b]; *Nicholson*, 3 NY3d at 368-369) are repeated in the guidelines. The ALJ failed to set forth his consideration of the relevant guidelines for making such a determination, many of which, as the motion court pointed out, weighed in petitioner's favor, including factors 2 (the seriousness and extent of any injury to child), 3 (harmful effect on the child of the subject's actions or inactions), 5 (time since most recent incident of maltreatment), 6 (number of indicated incidents of abuse or maltreatment), 8 (a) (whether the acts have been repeated) and 10 (whether reported behavior involved serious injury to, or death of, a child). The single factor the ALJ discussed, factor 8 (b), "any information produced . . . in regard to . . . rehabilitation," failed to consider that all of the evidence at the hearing indicated that petitioner has never been convicted of any crime, including for the events of December 30, 2012; no further such incidents had occurred; petitioner had no prior history with ACS; all of her family members interviewed expressed surprise at her behavior on the occasion leading to the report; and she told the caseworker she had "learned her lesson."

Like the plaintiffs in the cases leading up to amendment of Social Services Law § 422 to require a higher burden of proof to deny a request to amend an indicated child abuse or neglect report, petitioner here will essentially be barred from pursuing a career in her chosen field of early childhood development, since "she will be refused employment simply because her

inclusion on the list results in an added burden on employers who will therefore be reluctant to hire her" (*Valmonte*, 18 F3d at 1001).

Furthermore, although "[a] trier of fact may draw the strongest inference that the opposing evidence permits against a witness who fails to testify in a civil proceeding" (*Matter of Nassau County Dept. of Social Servs. v Denise J.*, 87 NY2d at 79), the ALJ improperly inferred that the behavior in which petitioner engaged "will in fact reoccur," based solely on petitioner's failure to testify at the hearing, even though no evidence supported such a finding.

Accordingly, we affirm the motion court's order annulling the indicated report against petitioner. Concur—Mazzarelli, Andrias and Gesmer, JJ.

Tom, J.P., and Manzanet-Daniels, J., dissent in a memorandum by Tom, J.P., as follows: In this CPLR article 78 proceeding, petitioner challenges a determination by respondents that she was "indicated" for child maltreatment based on the use of her child to facilitate a crime. I would find that petitioner's utilization of her five-year-old son to steal two coats and a pair of boots from Bloomingdale's constituted maltreatment and was sufficiently egregious so as to create an imminent risk of physical, mental and emotional harm to the child (*see Matter of Bernthon v Mattioli*, 34 AD3d 1165, 1166 [3d Dept 2006], *appeal withdrawn* 8 NY3d 918 [2007]; *see generally* Social Services Law § 412 [2] [a]). Further, I would find that the ALJ's determination that petitioner's actions were reasonably related to employment in childcare was rational (*see Matter of Peckham v Calogero*, 12 NY3d 424, 431 [2009]), and that petitioner's name should remain on the registry maintained by respondent New York State Office of Children and Family Services (OCFS) for the purposes of informing providers and licensing agencies that she is the subject of an indicated child maltreatment report for future employment in child care or foster care, and adoption (*see* Social Services Law §§ 422, 424-a).

Initially, petitioner does not contest any of the underlying facts regarding the shoplifting incident or the factual findings made by the ALJ. Nor did she testify or present any evidence at the hearing before the ALJ to contradict respondent New York City Administration for Children's Services' (ACS) investigation notes and summary admitted into evidence. Thus, all the evidentiary facts and record evidence presented to the ALJ's were unchallenged.

The undisputed evidence shows that on December 30, 2012 petitioner tried to steal merchandise from Bloomingdale's us-

ing her five-year-old son to facilitate the theft. Specifically, after entering a fitting room, she hid two coats under her son's clothing and made him put on a pair of boots. She also concealed a coat under her own clothing and hid several cell phone cases on her person. The total value of the stolen merchandise was approximately $2,700.

A store detective noticed the merchandise was missing and stopped petitioner immediately as she tried to exit the fitting room. In response to questioning, petitioner admitted stealing the items. Petitioner was detained and arrested in the presence of the child and petitioner's sister came to pick up the child.[1]

Petitioner was charged with petit larceny, criminal possession of stolen property, and endangering the welfare of a child. She ultimately pleaded guilty to a lesser violation of disorderly conduct which was later sealed.

The Statewide Central Register of Child Abuse and Maltreatment (SCR)—operated by OCFS—received a telephone report of petitioner's arrest and referred the matter to ACS. Over the next two months, ACS investigated the issue.

According to the ACS notes in evidence, on December 31, 2012, the investigator went to petitioner's home and spoke with the family members including her mother and sisters. They were surprised about the stealing incident and stated that the child "gets everything he needs."

The investigator also met with the child, who appeared "calm," stated that he felt "happy" and "safe" at home. However, the child reported that petitioner had hit him in the past with her hands and had once smacked his lip causing him to bleed. The child also reported that his mother was taken to jail by the police because she was stealing, and, when asked if petitioner had ever stolen before, first responded "yes," then "no." The child also stated that the mother put shoes on him and the police took them away.

On January 4, 2013, the investigator spoke with the store detective who handled the matter at issue, and who stated that he did not see any suspicious marks on the child, that the child did not appear distraught by the incident, and that the child was playing with video games and interacting normally at that time.

---

1. While the majority correctly notes that there is no evidence that the child was transported to the precinct, contrary to the majority's description, the statement of the store detective contained in the ACS investigation notes was that the child was present when his mother was arrested. The separate statement from petitioner in which she claims her son was not present when she was arrested may refer to her formal arrest at the precinct.

On that same date, the investigator spoke with the school social worker, who also stated that she never observed any marks or bruises on the child or anything concerning regarding the child.

On January 7, 2013, the investigator met with petitioner at her home, who declined to comment on the shoplifting incident on the advice of counsel. She claimed that the child's basic needs were met at home and, in contrast with the child's statements, denied using any physical discipline. At the end of the visit, the child was described as "clean, healthy looking and cared for."

On January 31, 2013, the investigator again met with petitioner at her home. She asserted that the child did not see her getting arrested, that he was not separated from her for a long time, and that he was not "effected [sic]."

Apparently based on its investigation summary that "there is no child[ ] likely to be in immediate or impending danger of serious harm" and that no "Safety Plan/Controlling Interventions are necessary at this time," ACS did not commence a neglect proceeding against petitioner. However, on February 28, 2013, ACS closed the report as "indicated" against petitioner. In particular, the investigation narrative found that the allegation of inadequate guardianship was substantiated as petitioner was arrested for shoplifting in the presence of the child and used the child to "harbor stolen items." The narrative found that petitioner exercised poor judgment "and as a result the child's mental and emotional condition has been placed at risk of impairment. Child reported that he witnessed [petitioner] stealing items and being arrested as a result." CPS was directed to provide petitioner "with information to community based services such as parenting to teach her appropriate disciplinary method as well as decision making."

As noted above, the sole consequence of an "indicated" report is that petitioner's name was included in the registry maintained by OCFS for the purposes of informing providers and licensing agencies concerning petitioner's future application for childcare related employment, and foster care and adoption. Yet, as the majority notes, an agency may still choose to hire or approve persons with indicated reports provided they "maintain a written record, as part of the application file or employment record, of the specific reasons why such person was determined to be appropriate to receive a foster care or adoption placement or to provide day care services" (Social Services Law § 424-a [2] [a]).

Because petitioner claimed the indicated report would be a

"huge barrier in obtaining employment in the childcare/ education fields" she was interested in, she asked SCR to amend the report of maltreatment to unfounded. In May 2013, SCR denied the request, scheduled a hearing, and specifically determined that the maltreatment report "is relevant and reasonably related to employment, licensure or certification in the child care field." SCR noted that it had considered each of the factors set forth in the Guidelines for Determining Whether Indicated Instances of Child Abuse and Maltreatment are Relevant and Reasonably Related to Employment or Licensure, and referenced the factors that it deemed particularly relevant, including the detrimental or harmful effects of petitioner's actions on her son and her son's age at the time of the incident.

A hearing was held on October 25, 2013. ACS introduced its investigation records, and petitioner, who was represented by counsel, did not testify or call witnesses. Petitioner's attorney argued that her actions did not rise to the level of maltreatment and that "there's no sign that this is a pattern of behavior at all." Petitioner's attorney also contended that ACS argued that petitioner's actions rose to the level of maltreatment because any act of theft risks a physical confrontation, even though no violence occurred in this case. ACS also contended that her actions placed the child at risk of mental or emotional harm by exploiting her child to commit a crime. ACS further argued that her improper conduct was reasonably related to work in the field of childcare because it showed that she failed to exercise even a minimum degree of care of her child and showed that she would be a poor role model for children.

In a written decision on February 11, 2014, the ALJ denied petitioner's appeal, finding that (i) a fair preponderance of the evidence demonstrated maltreatment; and (ii) the maltreatment was relevant and reasonably related to employment in childcare. Significantly, the ALJ made the following relevant findings of fact:

"The [petitioner] was arrested while attempting to steal three coats, a pair of shoes, and several cell phone cases from Bloomingdales [sic]. At the time of her arrest, the [petitioner] had hidden two coats under [the child's] clothing and stolen a pair of boots, by having [the child] put on the stolen boots.

"[The child] was present when the [petitioner] was arrested.

"[The child] was not at all distraught and was playing with video games and interacting normally after the [petitioner] was detained for shoplifting.

"[Petitioner] exploited . . . her 5 year old son for the purposes of shoplifting."

Based on the record evidence, the ALJ concluded that petitioner's actions placed the child "at imminent risk of physical and mental impairment," that petitioner "failed to exercise a minimum degree of care under the circumstances in question," and "[t]hat failure is what placed [the child] in imminent risk of physical and emotional impairment." More specifically, the ALJ found that "[t]he criminal act of shoplifting can result in a physical or violent response, creating a threat of harm to the child's physical condition." As to the child's mental or emotional health, the ALJ found that "[e]xploitation of a child to commit a crime, as well as teaching a child how to commit a crime, rises to . . . a level of outrageous behavior," and "create[d] an imminent risk to the child's emotional condition in that [the child] will not control his impulses, and will proceed from accompanying his mother in shoplifting to doing it on his own." He also remarked that "[o]ne expects a parent to teach a child . . . to not steal" but that petitioner exploited her son and taught him stealing was "acceptable behavior" and "how to shoplift." Moreover, he noted that the fact that the child does not "comprehend the gravity of the circumstances under which the mother is being arrested, does not negate the fact that the child is being endangered by the mother's action."

The ALJ also found that petitioner's maltreatment is "currently relevant and reasonably related to childcare employment, the adoption of a child or the provision of foster care." This determination was based on his prior discussion of petitioner's actions in "exploiting a child in order to commit a criminal act," and a negative inference he drew against petitioner for failing to testify. In that regard, he noted that petitioner failed to present "evidence of remedial steps which would prevent [her] behavior from reoccurring."

Petitioner commenced this article 78 proceeding challenging the determination as affected by errors of law and as lacking a rational basis in law and fact. Supreme Court granted the petition on the grounds that the ALJ "misapplied the statutory standard for maltreatment and misapplied the *Nicholson* standard," and that the ALJ failed to consider all of the OCFS Guideline factors for whether maltreatment is relevant and reasonably related to employment or licensure.

It is well established that the scope of review of petitioner's article 78 petition is whether respondents' determination denying petitioner's request to amend her indicated report to unfounded was arbitrary and capricious, lacked a rational basis or was affected by an error of law (CPLR 7803 [3]; *Peckham*, 12 NY3d at 431; *Matter of Pell v Board of Educ. of Union Free*

*School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, West-chester County*, 34 NY2d 222, 231 [1974]). Notably, "[a]rbitrary action is without sound basis in reason and is generally taken without regard to the facts" (*Pell*, 34 NY2d at 231). If there is a rational basis for the determination, a reviewing court may not substitute its own judgment even if the court concludes that it would have reached a different result than the one reached by the agency (*Peckham*, 12 NY3d at 431).

Here, in determining whether ACS established maltreatment by a fair preponderance of the evidence in accordance with Social Services Law § 422 (8) (which was amended in 2008 to comply with rulings that the prior "some credible evidence" standard violated due process), the ALJ applied the correct standard of review pursuant to *Nicholson v Scoppetta* (3 NY3d 357, 368 [2004]), i.e., "first, that a child's physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired and second, that the actual or threatened harm to the child is a consequence of the failure of the parent or caretaker to exercise a minimum degree of care in providing the child with proper supervision or guardianship." Indeed, the ALJ specifically cited to these standards in his decision.

It is therefore unclear why the majority sets forth the litigation and legislative history relating to the Social Services Law and the pre-2008 standard requiring that a child protective agency had to show that there was "some credible evidence" of maltreatment. Nothing in this record supports a finding that this outdated standard was applied by the ALJ.

Further, the ALJ properly utilized the statutory definition of a maltreated child pursuant to 18 NYCRR 432.1 (b) (1), which provides in pertinent part that a maltreated child is one

"whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his parent or other person legally responsible for his care to exercise a minimum degree of care . . .

"(ii) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or a substantial risk thereof, including the infliction of excessive corporal punishment; or by misusing a drug or drugs; or by misusing alcoholic beverages to the extent that he loses self-control of his actions; or by any other acts of a similarly serious nature requiring the aid of the court."

The ALJ also applied the correct definition for impairment of mental or emotional health pursuant to Family Ct Act § 1012

(h). That section provides as follows: " 'Impairment of emotional health' and 'impairment of mental or emotional condition' includes a state of substantially diminished psychological or intellectual functioning in relation to, but not limited to, such factors as failure to thrive, control of aggressive or self-destructive impulses, ability to think and reason, or acting out or misbehavior, including incorrigibility, ungovernability or habitual truancy; provided, however, that such impairment must be clearly attributable to the unwillingness or inability of the respondent to exercise a minimum degree of care toward the child."

Based on the foregoing applicable standards and the undisputed record evidence, the ALJ rationally concluded that petitioner's actions in exploiting her five-year-old son to steal caused the child's mental and emotional condition to be in imminent danger of impairment. There can be no doubt that exploiting a child to steal and teaching a child that such behavior is acceptable has long-lasting consequences for that child's emotional and mental development at an age when the child primarily learns from observation of the parent's actions. There is simply nothing irrational about reaching such a conclusion.

Similarly, the ALJ rationally found that petitioner's action in using her child to commit a crime placed her son in imminent danger of physical harm. While this case does not entail the more extreme circumstances present in *Matter of Rashard D.* (15 AD3d 209 [1st Dept 2005] [child directed to rob a bank]), even the commission of minor crimes, especially those involving theft, raises the potential for physical harm to the participants.

In fact, using a child to aid in shoplifting "would support a finding of neglect" (*Matter of Bernthon v Mattioli*, 34 AD3d at 1166).[2] Even a single incident "where the parent's judgment was strongly impaired and the child exposed to a risk of substantial harm can sustain a finding of neglect" (*Matter of Kayla W.*, 47 AD3d 571, 572 [1st Dept 2008] [internal quotation marks omitted]). And, utilizing and teaching a child to steal is the type of outrageous behavior which in and of itself

---

**2.** The "legal questions at stake in *Bernthon*" are different from those raised here, *but* the reason the Third Department permitted hearsay statements at the custody trial was because those statements—that the child had been used by her father to aid his shoplifting—supported the allegations of neglect raised in that custody proceeding. In any event, it is a correct statement of the law to note that evidence of using a child to aid in shoplifting would support a finding of neglect.

creates an imminent risk of emotional harm to the child (*see e.g. Matter of Christina LL.*, 233 AD2d 705 [3d Dept 1996], *lv denied* 89 NY2d 812 [1997]).

Contrary to the majority's contention, it is of no moment that there was no evidence before the ALJ that the child suffered a specific tangible injury (*see Nicholson*, 3 NY3d at 369 [" 'Imminent danger' reflects the Legislature's judgment that a finding of neglect may be appropriate even when a child has not actually been harmed"]). The imminent danger standard exists specifically to protect children who have not yet been harmed and to prevent impairment (*see Matter of Nassau County Dept. of Social Servs. v Denise J.*, 87 NY2d 73, 79 [1995]). Here, the basis for the ALJ's determination was not actual harm but a risk of imminent harm to the child. Thus, for example, we have upheld a finding of neglect where a mother was found intoxicated on the street with her child even though the child did not suffer actual injury (*see Matter of Pedro C. [Josephine B.]*, 1 AD3d 267 [1st Dept 2003]). It is of no moment that ACS determined in its discretion not to pursue a neglect proceeding against petitioner.

Nor were findings from mental health experts necessary to support the ALJ's determination. While such additional evidence may have been helpful, it was rational for the ALJ to conclude that this serious incident of theft, which, according to the child, may have occurred before, presented an imminent risk of impairment to the child.

As to the issue of imminence, I see nothing irrational about finding that the risk to this child caused by petitioner's actions was "near or impending" and not "merely possible" (*Nicholson*, 3 NY3d at 369). Initially, the potential for physical confrontation during a theft is imminent. Further, utilizing a child to commit a crime and teaching a child that such behavior is acceptable must have an immediate impact on that child's emotional and mental well-being, particularly in a young child who is just learning to differentiate between right and wrong. As the ALJ noted, this is so even where the child does not "comprehend the gravity of the circumstances."

I disagree with the majority that cases finding no maltreatment where a parent engaged in a single instance of corporal punishment are dispositive here (*see e.g. Matter of Senande v Carrion*, 83 AD3d 851 [2d Dept 2011] [mother hit child with a slipper]). While the majority may consider only physical harm to be "far more immediate," mental and emotional harm can be just as immediate. Nor is a finding of maltreatment limited to situations in which parents engage in even more "extreme

parental behavior resulting in obvious danger" (*see e.g. Matter of Rosemary V. [Jorge V.]*, 103 AD3d 484 [1st Dept 2013] [father left children home alone at night so he could engage in a narcotics transaction]).

More significant, to describe the ALJ's determination as "subjective" or to intimate that petitioner's actions were merely "foolish" or constituted "undesirable parental behavior" (*Nicholson*, 3 NY3d at 369) is simply unfounded and erroneous. The majority relies on cases involving the accidental or passive creation of a risk to a child. However, this case does not concern the type of accidental corporal punishment at issue in *Matter of Parker v Carrión* (80 AD3d 458 [1st Dept 2011]). Nor does it concern the range of things that might be considered merely undesirable parenting such as corporal punishment, allowing a child to stay up late, permitting the consumption of excessive unhealthy foods, or allowing a child to watch an extremely violent film. Here, we have a parent teaching a child how to commit a crime.

Certainly, this case bears no relation to the "undesirable parental behavior" at issue in *Nicholson*, which concerned the difficult choices faced by battered mothers (*see* 3 NY3d at 371). Indeed, this case is not akin to the circumstances of a child being exposed to domestic violence against his parent. Rather, this case concerns petitioner exhibiting a strongly impaired judgment when she purposely used her child to steal and taught him such behavior was appropriate. Once again, a child of such tender age learns from observing the parent's actions whose actions will have a long-lasting effect on the child. Of course, the majority can identify no precedent treating the intentional exploitation of a child to commit a crime as merely undesirable.

I would also find that the ALJ rationally found that petitioner's actions are reasonably related to a position in childcare. As a matter of common sense, it should go without saying that an individual who utilizes her own child to commit a crime and teaches the child how to steal lacks the necessary judgment to care for children, and would serve as a poor role model for them. In any event, the ALJ's decision indicates that he considered the relevant OCFS Guidelines. Initially, SCR's denial of petitioner's request was before the ALJ and it detailed various relevant factors, including the detrimental or harmful effects of petitioner's actions on her son and her son's age at the time of the incident. In addition, the guidelines emphasize that "not all factors will be relevant to each particular case" and thus, contrary to the majority's position, the ALJ was not mandated to discuss all the factors.

Also contrary to the majority's claim, the ALJ considered more than one factor. Indeed, by referring to his previous discussion about the nature of petitioner's actions, the ALJ was considering the seriousness of the incident (factor 1) and the age of the child (factor 4), both of which do not weigh in petitioner's favor. Nor would I find that the passage of only one year between the incident and the hearing (factor 5) weighed in petitioner's favor. The fact that no serious injury occurred to the child (factor 2) or that no other incidents of maltreatment were known to the ALJ (factor 6) are not factors that needed to be discussed. Nor was factor 10, which concerns incidents of serious injury or death, relevant to the determination.

Moreover, as the majority recognizes, the ALJ properly took a strong inference against petitioner for failing to testify at the hearing (*see Denise J.*, 87 NY2d at 79). Accordingly, he properly found that factor 8 (b), which concerns whether there is any evidence of rehabilitation, weighed against petitioner, who decided not to testify at the hearing. Further, a negative inference could be drawn not only that shoplifting would reoccur but also that it had happened in petitioner's past based on the child's response to ACS' investigator's question concerning whether petitioner had ever stolen before; the child initially responded "yes" then "no."

Finally, it appears that the majority's decision is based in part on a concern that petitioner "will essentially be barred from pursuing a career in her chosen field of early childhood development." First, this ignores the fact that petitioner will not be precluded from such work but would be required to face an appropriate obstacle given her actions. If petitioner can demonstrate she has changed, an employer may choose to hire her and will simply explain why she is an appropriate hire in writing. More important, the majority ignores what should be the main concern: the purpose of the registry is primarily to protect children who may have the misfortune of being cared for and miseducated by caregivers such as petitioner. If petitioner can exploit her own child to commit a crime, how can she be entrusted to care for other children when no evidence was presented to show petitioner has been rehabilitated? The focus of concern should be on the vulnerable children who are in need of child or foster care and adoption. Regardless, the majority is improperly substituting its judgment for that of the agency, which most certainly had a rational basis for its determination.

For these reasons, I would reverse Supreme Court's order and dismiss this proceeding.