Matter of Natasha W. v New York State Off. of Children & Family Servs. (2018 NY Slip Op 04379)

Matter of Natasha W. v New York State Off. of Children & Family Servs.

2018 NY Slip Op 04379 [32 NY3d 982]

June 14, 2018

Court of Appeals

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, November 21, 2018

[*1]

In the Matter of Natasha W., Respondent,
v
New York State Office of Children and Family Services et al., Appellants, et al., Respondent.

Argued May 1, 2018; decided June 14, 2018

Matter of Natasha W. v New York State Off. of Children & Family Servs., 145 AD3d 401, reversed.

APPEARANCES OF COUNSEL

Barbara D. Underwood, Attorney General, New York City (Matthew W. Grieco and Anisha S. Dasgupta of counsel), for appellants.
Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York City (Audra J. Soloway, Adam J. Bernstein, Kimberly A. Francis, Sierra A.Y. Robart and Christopher H. Trivisonno of counsel), for respondent Natasha W.
NYU Family Defense Clinic, Washington Square Legal Services, New York City (Christine Gottlieb and Martin Guggenheim of counsel), for NYU Family Defense Clinic and others, amici curiae.

{**32 NY3d at 983} OPINION OF THE COURT

Memorandum.
The order of the Appellate Division should be reversed, without costs, and the petition dismissed. Contrary to petitioner's contention, this Court has jurisdiction over this appeal{**32 NY3d at 984} inasmuch as the dual dissent at the Appellate Division is on a question of law (see CPLR 5601 [a]; see also Matter of Kelly v Safir, 96 NY2d 32, 38 [2001]). On the merits, "[i]n reviewing an administrative agency determination, [courts] must ascertain whether there is a rational basis for the action in question or whether it is arbitrary and capricious" (Matter of Peckham v Calogero, 12 NY3d 424, 431 [2009] [internal quotation marks omitted]). "Arbitrary action is without sound basis in reason and is generally taken without regard to the facts" (Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 NY2d 222, 231 [1974]). "If the [reviewing] court finds that the determination is supported by a rational basis, [then] it must sustain the determination even if the [reviewing] court concludes that it would have reached a different result than the one reached by the agency" (Peckham, 12 NY3d at 431).
On this record, it was rational for the Administrative Law Judge to have concluded that the child was placed in imminent risk of impairment, constituting maltreatment (see Social Services Law § 412 [2] [a]; Family Ct Act § 1012 [f] [I] [B]; 18 NYCRR 432.1 [b]; see also Nicholson v Scoppetta, 3 NY3d 357, 368 [2004]), and that petitioner's [*2]actions are reasonably related to employment in the childcare field (see Social Services Law § 422 [8] [a] [ii]). The act in question—specifically, using the child as a pawn in a shoplifting scheme—"was sufficiently egregious so as to create an imminent risk of physical, mental[,] and emotional harm to the child" (Matter of Natasha W. v New York State Off. of Children & Family Servs., 145 AD3d 401, 411 [1st Dept 2016, Tom, J.P., and Manzanet-Daniels, J., dissenting]). There is imminent potential for physical confrontation during a theft from a department store monitored by security. Moreover, we agree with the dissenters at the Appellate Division that, under the circumstances presented here, "utilizing a child to commit a crime and teaching a child that such behavior is acceptable must have an immediate impact on that child's emotional and mental well-being," particularly where, as here, the child is "young [and] just learning to differentiate between right and wrong" (id. at 418). Likewise, the Administrative Law Judge rationally concluded that petitioner's actions are reasonably related to employment in the childcare field "[a]s a matter of common sense" (id. at 419).

Wilson, J. (dissenting). Natasha W., the single mother of a five year old, lived with her parents, had earned an Associate's{**32 NY3d at 985} degree, and was continuing at a well-regarded four-year college to earn a Bachelor's degree in Early Childhood Education. One day, inexplicably, she took her son to Bloomingdale's, outfitted him and herself in clothes (with a few cellphone cases hidden therein), and was arrested for attempted shoplifting. She had no prior involvement with the criminal justice system or child welfare services. Store security detained her, and her sister picked up the child. Store security personnel reported that the child was "not at all distraught" and was "interacting normally." The store kindly provided him a pair of new shoes to wear home, gratis.
Natasha W.'s shoplifting charge was resolved by an adjournment in contemplation of dismissal, meaning she would have no criminal record. However, after a call from a police officer regarding Natasha's arrest, the Statewide Central Register of Child Abuse and Maltreatment (Child Abuse Register) referred the case to the local child protective agency, the New York City Administration for Children's Services (ACS), which conducted a two-month-long investigation to determine whether her child was at risk from the shoplifting incident. ACS interviewed Natasha W., her parents and her sisters, all of whom said that Natasha W. had not done anything like this before and that her son was well-cared-for and well-adjusted. ACS also interviewed the social worker at the child's elementary school, who reported that she never observed anything concerning regarding the child. Based on its investigation, ACS found that the child was not "likely to be in immediate or impending danger of serious harm," and that no "Safety Plan/Controlling Interventions [were] necessary." Paradoxically, ACS marked its report as "indicated," meaning that evidence supported the conclusion that Natasha W. had maltreated her child. The immediate consequence to Natasha W. from that "indication" is that her name has been added to the Child Abuse Register, so that prospective employers in the occupation for which she has educated herself will be informed that she is unfit to work with children.
Natasha W. brought an administrative appeal, heard by an ALJ, to annul the "indicated" designation. The ALJ denied her appeal, holding as follows:
[*3]
"Exploitation of a child to commit a crime, as well as teaching a child how to commit a crime, rises to . . . a level of outrageous behavior . . . [and] creates an imminent risk to the child's emotional{**32 NY3d at 986} condition in that [Natasha W.'s child] will not control his impulses, and will proceed from accompanying his mother in shoplifting to doing it on his own. . . .
"Such maltreatment is found to be currently relevant and reasonably related to childcare employment, the adoption of a child or the provision of foster care."
On Natasha W.'s CPLR article 78 proceeding to vacate the administrative decision, Supreme Court rejected, as totally lacking in evidence, ACS's conclusion that the shoplifting incident would doom the child to a life of crime, aptly characterizing ACS's decision as "nothing but an offensive rendition of the adage that 'the apple does not fall far from the tree.' " The Appellate Division affirmed.
The majority now reverses the decision of both lower courts, claiming those courts violated the governing standard of review, namely:
" '[I]n reviewing an administrative agency determination, [courts] must ascertain whether there is a rational basis for the action in question or whether it is arbitrary and capricious' (Matter of Peckham v Calogero, 12 NY3d 424, 431 [2009] [internal quotation marks omitted]). 'Arbitrary action is without sound basis in reason and is generally taken without regard to the facts' (Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 NY2d 222, 231 [1974])" (majority mem at 
 984).
Even the oracle of Delphi would demur at the ALJ's prediction that this five-year-old child is destined for a life of crime, and Natasha W. is therefore unfit to pursue a career in elementary education or child care. Those predictions are based on no facts specific to this family, but on a per se rule that children whose parents involve them in a shoplifting attempt will grow up to be criminals, and parents who involve their children in shoplifting should be listed in the Child Abuse Register. Indeed, the facts found by ACS undercut any such prediction: Natasha W.'s child is well-adjusted and Natasha W. and other relatives with whom the child lives are caring, attentive and responsible. A reader of ACS's report would most likely think the "indicated" designation was a clerical error. Where is the "sound basis in reason?"{**32 NY3d at 987}
I
Social Services Law § 412 (2) (a) provides that, for purposes of placement of a responsible adult on the Child Abuse Register, a " 'maltreated child' includes a child under eighteen years of age . . . defined as a neglected child by the family court act." Thus, upholding the Office of Children and Family Services' (OCFS) placement of Natasha W. on the Child Abuse Register and upholding ACS's "indicated" entry requires that Natasha W.'s child meet the definition of a "neglected child" in Family Court Act § 1012 (f) (I) (B):
"(f) 'Neglected child' means a child less than eighteen years of age
"(I) whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his parent or other person legally responsible for his care to exercise a minimum degree of care
"(A) in supplying the child with adequate food, clothing, shelter or education in accordance with the provisions of part one of article sixty-five of the education law, or medical, dental, optometrical or surgical care, though financially able to do so or offered financial or other reasonable means to do so; or
"(B) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or a substantial risk thereof, including the infliction of excessive corporal punishment; or by misusing a drug or drugs; or by misusing alcoholic beverages to the extent that he loses self-control of his actions; or by any other acts of a similarly serious nature requiring the aid of the court . . . ."
ACS concedes Natasha W.'s child has no physical, mental or emotional impairment, either as a result of the shoplifting episode or otherwise. ACS's determination, as evidenced by the ALJ's decision, is that her child is "in imminent danger of becoming impaired." That rationale suffers from numerous insuperable defects.
First, ACS and the majority have read "imminent" out of the statute. "Imminent" means "Of an event . . . (almost always of {**32 NY3d at 988}evil or danger): Impending threateningly, hanging over one's head ready to befall or overtake one close at hand in its incidence coming on shortly" (Oxford English Dictionary [2018], imminent; see Yaniveth R. v LTD Realty Co., 27 NY3d 186, 192 [2016] ["In the absence of a statutory definition, 'we construe words of ordinary import with their usual and commonly understood meaning, and in that connection have regarded [*4]dictionary definitions as useful guideposts in determining the meaning of a word or phrase' "]). As we said in Nicholson v Scoppetta (3 NY3d 357, 369 [2004]), our leading case on this subject, "Imminent danger . . . must be near or impending, not merely possible." ACS's own factual findings demonstrate that Natasha W.'s child faced no imminent impairment of any kind. When Natasha W. was detained, her child was not distraught. When later interviewed, he told the investigator that his mother was taken away because she had stolen, but denied that she had asked him to steal. He also said that he felt safe at home. Natasha's sister, who lives in the same building, reported that the child had enough to eat, and that she had never known Natasha W. to steal or to harm the child in any way. Natasha W.'s other sister, who picked up the child after the incident, said that she had no concerns about Natasha W.'s ability to take good care of him. A social worker at the child's school said that she was familiar with the child and that she had no concerns about him. Most tellingly, ACS's determination that the family needed no intervention or assistance of any kind necessarily means that the child was not in "imminent danger" of impairment—unless we think that ACS deliberately abandons children in imminent danger. ACS determined that Natasha W. and her child require no services, but still awarded a modern-day scarlet A.
Second, even if the ALJ had correctly determined that Natasha W.'s son was in imminent danger of impairment, it would then have to find that such impairment was the result of Natasha W.'s "failure . . . to exercise a minimum degree of care," which must fall into one of two categories: (A) inadequate "food, clothing, shelter or education" where the parent has the ability to provide such; or (B) not "providing the child with proper supervision or guardianship" including, "the infliction of excessive corporal punishment; or by misusing a drug or drugs; or by misusing alcoholic beverages to the extent that he loses self-control of his actions; or by any other acts of a similarly serious{**32 NY3d at 989} nature requiring the aid of the court" (Family Ct Act § 1012 [f] [I] [A], [B]). Given ACS's factual finding that the child was "clean, healthy and cared for," and there was no suggestion, much less evidence, of drug or alcohol misuse, ACS must be relying on "any other acts of a similarly serious nature requiring the aid of the court." Shoplifting is not remotely comparable to excessive corporal punishment or drug or alcohol abuse leading to loss of control. Furthermore, ACS's determination that no court or agency intervention was needed means that Natasha W.'s situation fails the statutory mandate that the "other . . . serious" acts require the aid of the court.
Third, the majority's affirmance of the ALJ's prediction that, because Natasha W. shoplifted with her five year old, the child "will proceed from accompanying his mother in shoplifting to doing it on his own" creates a per se rule that a parent who engages in a crime (or, at least a crime as grave as attempting to shoplift boots and coats) with a young child has met the statutory definition of "neglect," because the apple does not fall far from the tree (or, perhaps, because the sins of the mother are visited on the child), without regard to any facts concerning the prospect of impairment as to the child in question. That per se rule is not merely incompatible with the legislature's requirement of "imminent" injury, but also with Nicholson.
On appeal, OCFS and the Child Abuse Register attempt to defend the ALJ's determination on an additional ground not proposed by the ALJ: Natasha W.'s "actions placed [the child] in imminent danger of physical harm because any act of theft carries the risk of a violent confrontation or arrest." Putting aside the fatal absence of any such argument, much less finding, in the ALJ's decision, the facts here are all to the contrary: the store was a high-end department store with a professional and discreet security force; Natasha W. did not create any sort of disruption or confrontation when apprehended; and her child was picked up by her sister shortly thereafter. Frankly, the proposition that Bloomingdale's security personnel might rough up a five year old is preposterous, and certainly has no support in the record. More importantly, OCFS's rationale again creates a per se rule: "any act of theft carries the risk of violent confrontation," so that—contrary to the statutory language and Nicholson—the facts are irrelevant.
The logical extension of the majority's affirmance of the ALJ's decision is boundless. If Natasha W.'s child is in imminent danger of growing up to be a shoplifter, and therefore "neglected," what of a child whose parent exceeds the speed limit{**32 NY3d at 990} with the child in the car,[FN1] or teaches the child to jaywalk?[FN2] I start to worry that, when [*5]watching Disney's Aladdin with my children, or reading them Les Misérables, I had better not opine that theft of bread by a starving person is morally acceptable, lest they be deemed neglected and I placed on the Child Abuse Register. If we do not rely on facts showing actual or imminent injury to a specific child, there is no principled basis to draw a line between Natasha W.'s case and any of the above. If we do rely on such facts, none supports ACS's determination in her case.
II
Amici, numerous nonprofit organizations sharing the legislature's dual concern for child welfare and family integrity, point out that, although this case does not involve proceedings to remove a child from a home on grounds of neglect, the definition of "maltreatment" in Social Services Law § 412 (which contains the procedures governing appearance in the Child Abuse Register) expressly includes the definition of a "neglected child" under the Family Court Act. Thus, although OCFS made no attempt to separate Natasha W. from her child, a finding of neglect is a basis for commencing such a proceeding. That observation demonstrates how fundamentally at odds today's brief memorandum decision is with Nicholson. There, we expressly noted that the legislature carefully circumscribed the definition of neglect because it was " 'deeply concerned' that an imprecise definition of child neglect might result in 'unwarranted state intervention into private family life' " (Nicholson, 3 NY3d at 368, quoting Besharov, Practice Commentaries, McKinney's Cons Laws of NY, Book 29A, Family Ct Act § 1012 at 320 [1999 ed]). We unanimously reemphasized that proposition a few months ago.
"Neglect findings cannot be casually issued, but require proof of actual or imminent harm to the child as a result of a parent's failure to exercise a minimum degree of care. 'This prerequisite . . . {**32 NY3d at 991}ensures that the Family Court, in deciding whether to authorize state intervention, will focus on serious harm or potential harm to the child, not just on what might be deemed undesirable parental behavior' " (Matter of Jamie J. [Michelle E.C.], 30 NY3d 275, 284 [2017] [citations omitted], quoting Nicholson, 3 NY3d at 369).
Accordingly, I dissent.
Chief Judge DiFiore and Judges Rivera, Stein, Fahey, Garcia and Feinman concur; Judge Wilson dissents in an opinion.
Order reversed, without costs, and petition dismissed, in a memorandum.

Footnotes

Footnote 1:"From 2010 to 2015, 59,374 American lives were lost in crashes related to excessive speed" (Vision Zero Network, National Speed Fatality Map Highlights Tragic Losses, available at https://visionzeronetwork.org/resources/speed-fatality-map/).

Footnote 2:Jaywalking is a leading cause of pedestrian accidents among children (Most children struck by cars due to jaywalking, darting into street, LA Times, Oct. 19, 2012, available at http://articles.latimes.com/2012/oct/19/news/la-heb-children-struck-by-cars-jaywalking-darting-into-street-20121019).