Matter of Habif v New York State Workers' Compensation Bd. (2022 NY Slip Op 03956)

Matter of Habif v New York State Workers' Compensation Bd.

2022 NY Slip Op 03956

Decided on June 16, 2022

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:June 16, 2022

533307
[*1]In the Matter of Marc Lawrence Habif, Appellant,
v
New York State Workers' Compensation Board, Respondent.

Calendar Date:April 26, 2022

Before:Egan Jr., J.P., Lynch, Aarons, Reynolds Fitzgerald and Ceresia, JJ.

Barnes & Barnes, PC, Melville (Leo K. Barnes Jr. of counsel), for appellant.
Letitia James, Attorney General, Albany (Kathleen M. Treasure of counsel), for respondent.

Ceresia, J.
Appeal from a judgment of the Supreme Court (Rivera, J.), entered April 9, 2021 in Albany County, which dismissed petitioner's application, in a proceeding pursuant to CPLR article 78, to review a determination of respondent denying petitioner's application to be an authorized medical provider.
Petitioner is a licensed chiropractor who, beginning in 1999, was authorized by respondent to provide care and treatment to injured workers pursuant to the Workers' Compensation Law. In 2019, during an investigation of another chiropractor, respondent determined that Elite Medical Supply of New York, LLC, a supplier of durable medical equipment (hereinafter DME), was making unlawful payments to chiropractors in exchange for prescribing Elite's DME to injured workers. Suspecting that petitioner was one of the chiropractors receiving payments from Elite, respondent opened an investigation of petitioner and requested that he provide, among other things, a copy of any agreement that he had with any DME supplier. Petitioner produced a written contract with Elite, denominated as a "Services Agreement," wherein he had agreed to be compensated for performing services, including fitting his workers' compensationpatients with, and providing instructions on the proper care and use of, Elite's DME. Petitioner disclosed that he had received a total of $27,500 in payments from Elite during the time period covered by respondent's investigation, and that he had not prescribed DME to his workers' compensation patientsfrom any supplier other than Elite during that period.
Shortly thereafter, and while the investigation was ongoing, petitioner filed with respondent his mandatory triennial application to renew his authorization to treat injured workers.[FN1] Petitioner then received a letter from respondent indicating that his renewal application had been denied based upon his admitted receipt of payments from a third party in connection with his treatment of injured workers and directing petitioner to cease providing care to workers' compensation claimants. As a result, petitioner commenced the instant proceeding to challenge respondent's determination. Supreme Court dismissed the petition, and petitioner appeals. We affirm.
As a preliminary matter, petitioner was not improperly deprived of a hearing, as he contends. The applicable statutes and regulations distinguish between denying a provider's initial or renewal application for authorization to treat workers and removing a provider from the list of authorized providers during the course of his or her term. As has been noted in a similar context — that of health care providers participating in the Medicaid program — "[t]he procedures for enrollment and reenrollment of providers . . . are treated separately and distinctly from those for termination or suspension of participation in [the program] by a provider once duly accepted as an enrolled provider, during a specified period of enrollment. . . . [T]he available [*2]sanctions against a provider formally found guilty of engaging in an unacceptable practice may be significantly more severe and stigmatizing than the mere refusal to enroll or reenroll a . . . provider" (Matter of Bezar v New York State Dept. of Social Servs., 151 AD2d 44, 48 [1989] [citations omitted]; see Matter of Kothari v Perales, 174 AD2d 621, 621 [1991]).
Here, petitioner was not removed from the program in the midst of his term as an authorized provider — rather, his renewal application was simply denied. That said,the regulation governing both initial and renewal applications for authorization to treat workers' compensation claimants contains no provision for a hearing prior to the approval or denial of such applications (see 12 NYCRR 323.1). Accordingly, under these particular circumstances, petitioner was not entitled to a hearing. To the extent that petitioner relies upon Workers' Compensation Law § 13-l (10) to support his claim that a hearing was necessary, this statutory subsection sets forth a procedural framework that applies when charges of professional misconduct are filed against a provider in furtherance of a midterm removal, which again is not the case here. As such, this procedural framework is inapplicable in this instance.
Next, contrary to petitioner's assertion, respondent's denial of petitioner's renewal application "contain[ed] sufficient information to permit this Court to both discern the rationale for the administrative action taken and undertake intelligent appellate review thereof" (Matter of Office Bldg. Assoc., LLC v Empire Zone Designation Bd., 95 AD3d 1402, 1405 [2012]; accord Matter of Greece Town Mall, L.P. v New York State, 140 AD3d 1380, 1382-1383 [2016]). Inasmuch as respondent's letter to petitioner stated that respondent's investigation, as well as petitioner's own submissions, revealed that petitioner accepted $27,500 in payments from a DME supplier in relation to his treatment of injured workers, which constituted a violation of both the Workers' Compensation Law and the rules of the Board of Regents, "[t]he denial was adequately explained" (Matter of Long Is. Light. Co. v New York State Dept. of Envtl. Conservation, 145 AD2d 70, 73 [1989]).
Turning to the merits of the petition, nearly a century ago, recognizing that the medical care and treatment of injured workers "had degraded into a mere commercialized venture," the Legislature enacted a statutory ban on referral fees and other third-party payments in order to eliminate provider practices that "exploit[ed] worker[s], employer[s] and insurance carriers through prolonged treatment, padded bills and inferior professional service" (Szold v Outlet Embroidery Supply Co., 274 NY 271, 276 [1937] [internal quotation marks omitted], appeal dismissed 303 US 623 [1938]; see Matter of Van Dam v New Paltz Cent. School Dist., 46 AD3d 1194, 1195 [2007]). As a result, chiropractors, like all medical providers who treat workers' compensation claimants[*3], may only accept payment for treating an injured worker from the worker's employer (see Workers' Compensation Law §§ 13-f [1]; 13-l [4], [10] [g]).[FN2] Indeed, it is considered professional misconduct for any licensed chiropractor, whether authorized to treat workers' compensation claimants or not, to receive third-party payments in exchange for patient referrals or treatment (see 8 NYCRR 29.1 [b] [3]).
Petitioner contends, and respondent does not dispute, that Workers' Compensation Law § 13-d and the prohibitions against third-party payments and referral fees set forth therein did not apply to chiropractors at the time that petitioner accepted payments from Elite. However, such payments were prohibited elsewhere in the lawthroughout the relevant time period (see Workers' Compensation Law §§ 13-f [1]; 13-l [4], [10] [g]; 8 NYCRR 29.1 [b] [3]).[FN3]
Petitioner also argues that he did not violate any prohibition on receiving third-party payments for referrals or treatment because he was merely being nominallycompensated by Elite for performing services — including fitting patients with DME and instructing them on its care and use— which fell outside the bounds of medical treatment and for which he was not already being compensated by workers' compensation insurance. However, respondent reviewed the contract, which provided for compensation to petitioner at a flat rate for each unit of DME prescribed, pursuant to an attached fee schedule. Respondent also relied upon petitioner's answers to interrogatories, wherein he stated that all of the DME he prescribed during the time period in question was supplied by Elite, as well as a chart provided by petitioner revealing that he received over 200 separate payments from Elite at rates of $100 or $150 per unit of DME, in accordance with the fee schedule. Given this evidence, respondent's determination that petitioner was receiving impermissible kickbacks from Elite in exchange for prescribing its DME had a rational basis and was neither arbitrary nor capricious (see Matter of Natasha W. v New York State Off. of Children & Family Servs., 32 NY3d 982, 984 [2018]; Matter of Beer v New York State Dept. of Envtl. Conservation, 189 AD3d 1916, 1918 [2020]). As such, the determination will not be disturbed.
Egan Jr., J.P., Lynch, Aarons and Reynolds Fitzgerald, JJ., concur.
ORDERED that the judgment is affirmed, without costs.

Footnotes

Footnote 1: Every authorized medical provider must renew their authorization to treat injured workers within 30 days of their license renewal with the State Education Department (see 12 NYCRR 323.1 [g]). Chiropractors must renew their licenses every three years (see Education Law § 6554-a [1] [a]).

Footnote 2: Practically speaking, the provider is typically compensated by the employer's insurance carrier (see Workers' Compensation Law §§ 25, 50), although an employer may elect to be self-insured (see Workers' Compensation Law § 50 [3]).

Footnote 3: As noted above, the procedural framework contained within Workers' Compensation Law § 13-l (10) was not applicable here. Nevertheless, the enumerated grounds for removal contained within that statute (see Workers' Compensation Law § 13-l [10] [a]-[g]), including receiving unauthorized fees for treating workers' compensation claimants (see Workers' Compensation Law § 13-l [10] [g]), are still relevant. To be sure, if receiving improper third-party payments constitutes a ground for removal of an authorized provider in the middle of the provider's three-year term, such conduct can also appropriately serve as a basis for denying a renewal application at the end of the term.