OPINION OF THE COURT
Rose, J.
In 2004, respondents Preserve Associates, LLC, Big Tupper, LLC, Tupper Lake Boat Club, LLC and Nancy Hull Godshall, as trustee of respondent Oval Wood Dish Liquidating Trust (hereinafter collectively referred to as the developers), submitted an application to respondent Adirondack Park Agency (hereinafter the APA) for conceptual approval of the proposed Adirondack *68 Club and Resort — the largest project ever proposed for New York’s 6,000,000-acre Adirondack Park — to be located on privately-owned land in the Town of Tupper Lake, Franklin County. The 6,235-acre project site includes and surrounds the closed Big Tupper ski area. It is bordered by, among other things, the Village of Tupper Lake, State Route 30 and a municipal golf course. The application for permit approval submitted by the developers in 2005 proposed reopening the Big Tupper ski area, renovating and utilizing the closed McDonald’s Marina on Tupper Lake, and building over 600 “second home” residential units of various styles — including “Great Camps” to be built on substantial acreage — a hotel with numerous amenities and several other recreational resources, such as a skating pond, an informal bandstand/amphitheater and hiking trails. The application was amended and supplemented by the developers several times until it was deemed complete by the APA in 2006.
In 2007, the APA ordered that an adjudicatory hearing be conducted and identified the issues for determination. Discovery and mediation sessions were conducted between 2007 and the commencement of the public hearing held in 2011. As a result of these efforts, the developers submitted updated application information in 2010.[1] Parties to the 19-day public hearing included the developers, the Village of Tupper Lake, the Town of Tupper Lake, the Town of Tupper Lake Planning Board, the Adirondack Park Local Government Review Board, nearby landowners and petitioners.[2] Following the hearing, the APA voting members publicly deliberated during seven days of open meetings held over the course of several months, culminating in their nearly unanimous vote to approve the application in January 2012. Shortly thereafter, the APA issued an extensive final order and drafted 14 permits for the various aspects of the project, which will be issued upon the satisfaction of the terms and *69 conditions set forth in the order. As approved, the project will include 659 residential units, a 60-bedroom inn, a downhill ski area, a marina and valet boat launching service, over 15 miles of public and private roads, wastewater treatment systems and various recreational amenities and maintenance facilities. Construction of the project is planned in four phases over 15 years.
In March 2012, petitioners commenced this proceeding pursuant to CPLR article 78 seeking to annul the APA’s determination approving the developers’ application. Respondent Department of Environmental Conservation (hereinafter DEC) was also named as a party to this proceeding. The 153-page amended petition alleges 29 causes of action, including procedural and substantive violations of the Adirondack Park Agency Act, the Freshwater Wetlands Act, the State Administrative Procedure Act and various related regulations. Following petitioners’ largely unsuccessful motion before Supreme Court for leave to conduct discovery (38 Misc 3d 1235[A], 2013 NY Slip Op 50393[U], *5 [2013]), the matter was transferred to this Court for review (see CPLR 7804 [g]). Thereafter, we granted petitioners’ motion for permission to appeal from Supreme Court’s order denying their motion for leave to conduct discovery and permitted the appeal and the proceeding to be heard together (2013 NY Slip Op 74165[U] [2013]).[3]
I. Standard of Review
Judicial review of the APA’s determination, made after a hearing at which evidence was taken pursuant to law, is limited to whether the decision is supported by substantial evidence (see CPLR 7803 [4]; Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 NY2d 222, 231 [1974]; Matter of Sutherland v Glennon, 221 AD2d 893, 894 [1995]). Substantial evidence does not require overwhelming evidence or even a preponderance of the evidence (see Matter of Ridge Rd. Fire Dist. v Schiano, 16 NY3d 494, 499 [2011]; 300 Gramatan Ave. Assoc. v *70 State Div. of Human Rights, 45 NY2d 176, 180-181 [1978]; Matter of Rauschmeier v Village of Johnson City, 91 AD3d 1080, 1082 [2012], lv denied 19 NY3d 802 [2012]). Rather, all that is required is “ ‘relevant proof [that] a reasonable mind may accept as adequate to support a conclusion or ultimate fact’ ” (Matter of Rauschmeier v Village of Johnson City, 91 AD3d at 1082, quoting Matter of Ridge Rd. Fire Dist. v Schiano, 16 NY3d at 499; accord Matter of Dewitt v New York State Bd. of Law Examiners, 90 AD3d 1457, 1457 [2011], lv denied 18 NY3d 810 [2012]). Additionally, “[t]he fact that a different conclusion could have been reasonably reached is not sufficient ground to set aside the determination” (Matter of Cohn Chemung Props., Inc. v Town of Southport, 108 AD3d 928, 929 [2013]; see Matter of Steinberg v DiNapoli, 93 AD3d 1068, 1069 [2012]; Matter of Friedman v Adirondack Park Agency, 165 AD2d 33, 38 [1991], lv denied 78 NY2d 853 [1991]).
To the extent that petitioners argue that the APA’s determination was affected by errors of law (see CPLR 7803 [3]), this Court’s “review of these arguments, made in a CPLR article 78 proceeding following a hearing, is limited to whether the [APA] exceeded its authority, violated a controlling law or otherwise acted in an arbitrary and capricious manner” (Matter of Cohn Chemung Props., Inc. v Town of Southport, 108 AD3d at 929; see e.g. Matter of Small v City of N.Y. Dept. of Sanitation, 74 AD3d 828, 829 [2010]). The APA’s authority stems from the Adirondack Park land use and development plan, which “serve[s] to guide land use planning and development throughout the entire area of the Adirondack [P]ark” (Executive Law § 805 [1] [a]). Pursuant to this plan, land within the Adirondack Park is characterized as one of six land use areas, each of which has its own individualized guidelines for overall intensity of development (see Executive Law § 805 [3] [c]-[h]).
Significantly, before new development is undertaken, the APA must “consider those factors contained in the development considerations of the plan which are pertinent to the project under review” and determine that the proposed project “would not have an undue adverse impact upon the natural, scenic, aesthetic, ecological, wildlife, historic, recreational or open space resources of the park” (Executive Law § 809 [10] [e]; see also Executive Law § 805 [4]). In considering whether any adverse impact is undue, Executive Law § 809 (10) (a) and (b) require the APA to determine that a project is “consistent with the land use and development plan” and “compatible with the character *71 description and purposes, policies and objectives of the land use area wherein it is proposed to be located.” In doing so, the APA must also consider the burden that development will place on public services, as well as any “commercial, industrial, residential, recreational or other benefits that might be derived from the project” (Executive Law § 809 [10] [e]; see Executive Law § 805 [4]).
II. Substantive Challenges
A. Cranberry Pond
Cranberry Pond is a 26-acre body of water with surrounding wetlands located in a moderate intensity land use area “where the capability of the natural resources and the anticipated need for future development indicate that relatively intense development, primarily residential in character, is possible, desirable and suitable” (Executive Law § 805 [3] [d] [1]).[4] The record establishes that the revitalization of the preexisting Big Tupper ski area is a key initial component of the planned development and is essential to the generation of funding for later phases of the project. In issuing the permit for the ski area, the APA credited evidence proffered by the hearing staff and permitted the temporary use — for a minimum of two years and a maximum of five years — of Cranberry Pond as the water source for snow-making activity at the ski area.
Although petitioners argue that the determination is not supported by substantial evidence because the permit requires an “after-the-fact” study to assess the impact of drawing water from the pond, we are not persuaded. Petitioners do not dispute that the developers proposed Cranberry Pond as a water source for snowmaking operations only after determining that the costs associated with using nearby Tupper Lake would be significantly higher, making the reopening of the ski area financially unfeasible.[5] Nor do they dispute that Cranberry Pond currently supplies a sufficiently rechargeable amount of water to be used by the Town during the golfing season to irrigate a nearby municipal golf course. Further, the pond was previously used as a snow-making source for this same ski area, pursuant to APA-issued *72 permits, when the ski area was operated as Big Tupper in the late 1990s. Although there was limited data from the previous use of Cranberry Pond for snowmaking, that data did not indicate any undue adverse impacts resulting from those withdrawals (compare Matter of Pyramid Co. of Watertown v Planning Bd. of Town of Watertown, 24 AD3d 1312, 1314 [2005], lv dismissed 7 NY3d 803 [2006]). In the absence of an operating ski area and the actual use of the pond for snowmaking, any impact on the water volume of the pond during the ski season— and its consequences — cannot be known. Until empirical data can be gleaned, the strict conditions imposed in the permit appropriately provide the APA with continuing oversight (see Executive Law § 809 [13]).[6] Despite testimony that, due to the shallowness of Cranberry Pond, water withdrawals could have negative impacts on wildlife, there is substantial evidence in this 80-volume record to support the APA’s determination to permit the temporary use of Cranberry Pond, conditioned upon the monitoring of water levels and a continuing assessment of potential impacts (see Matter of Dudley Rd. Assn. v Adirondack Park Agency, 214 AD2d 274, 281 [1995], lv dismissed and denied 87 NY2d 952 [1996]; Matter of Lake George Assn. v Lake George Park Commn., 213 AD2d 867, 868-869 [1995]; Matter of Friedman v Adirondack Park Agency, 165 AD2d at 38).
There is also substantial evidence to support a finding that the permit for the use of Cranberry Pond complies with the Freshwater Wetlands Act (see ECL art 24).[7] Among other things, the APA considered the limited time period during which withdrawals from Cranberry Pond will be permitted to occur and the evidence of the prohibitive cost of using Tupper Lake as a water source during the initial phases of the project. Accordingly, the APA could rationally conclude that a permit to use Cranberry Pond was authorized because it was “the only alternative which reasonably can accomplish the applicant’s objectives” (9 NYCRR 578.10 [a] [2] [ii]).
*73 B. Wildlife and Wildlife Habitats
In examining the project’s potential impacts on the Adirondack Park’s wildlife, the APA considered “[c]ritical resource areas,” which include the “[h]abitats of rare and endangered species and key wildlife habitats” (Executive Law § 805 [4] [a] [5] [c]).[8] Site investigations revealed that there are no known rare plant communities on the project site and “[n]o rare, threatened or endangered species are known to occur on the site, nor were any observed on-site.”[9] Although a deer wintering yard, one of the key wildlife habitats identified in APA regulations (see 9 NYCRR 574.5 [a] [5] [iii] [b] [1]), is located in the northeastern portion of the project site, no development is proposed to occur in that location. In our view, the record contains substantial evidence to support the APA’s determination that there would be no undue adverse impacts to wildlife and their habitats on the project site. Moreover, in the absence of any evidence of protected species on the project site, we find that it was rational for the APA to approve the permit application without requiring the developers to conduct a comprehensive wildlife survey.[10]
C. Residential Development
There is also ample support for the APA’s determination that the construction of 80 single-family dwellings on the site’s resource management land use area complies with the Adirondack Park Agency Act’s land use and development plan.[11] The majority of the project site, over 4,700 acres, consists of resource *74 management lands, “where the need to protect, manage and enhance forest, agricultural, recreational and open space resources is of paramount importance because of overriding natural resource and public considerations” (Executive Law § 805 [3] [g] [1]). Additionally, “[t]he basic purposes and objectives of resource management areas are to protect the delicate physical and biological resources, encourage proper and economic management of forest, agricultural and recreational resources and preserve the open spaces that are essential and basic to the unique character of the park” (Executive Law § 805 [3] [g] [2]). As pertinent here, single-family dwellings fall under the category of compatible secondary uses on resource management lands (see Executive Law § 805 [3] [g] [4]), and are “allow[ed] ... on substantial acreages or in small clusters on carefully selected and well designed sites” (Executive Law § 805 [3] [g] [2]).[12]
As approved, the project will have 35 Great Camps and 45 single-family dwellings on over 4,700 acres of resource management lands, and petitioners do not challenge the compliance of these structures with the overall intensity guidelines.[13] Building construction will be confined to a three-acre envelope on each of the 35 Great Camp lots and a 2,500-square-foot footprint on each of the other 45 lots, thus allowing for preservation of open space on the remainder of each lot. There is evidence that the developers’ site plans are designed so that all structures are located in the most environmentally sound locations, adverse visual impacts are minimized and existing logging roads, skidder paths and low volume unpaved roadways are used for access in order to avoid “sensitive environmental resources.” Further, no development will occur within one-quarter mile of the Raquette River, or within 100 feet of any body of water or wetlands. Moreover, the APA’s order requires deed restrictions to prevent additional development, thus maintaining approximately 86% of the total project site — approximately 5,400 acres — as open space. Accordingly, there is substantial evidence in this extensive record to support the APA’s finding that the residential develop *75 ment is consistent with statutory requirements (see Executive Law § 805 [3] [g]).
Petitioners’ contention that the development of these residences will eliminate thousands of acres of timber in contravention of the resource management lands guidelines must also be rejected. The purposes and objectives of resource management areas include the encouragement of proper and economic management of both the forest and recreational resources of the Adirondack Park (see Executive Law § 805 [3] [g] [2]). Although the APA found that the project would necessarily eliminate some commercial timber harvesting activities on the resource management lands, it rationally determined that the development and implementation of a forest management plan as required by the permit for the Large Eastern Great Camp lots would “lead to a healthy working forest.”
D. Valet Service
Although it is undisputed that the project’s residents and guests will rely on the availability of the nearby state-owned, DEC-operated boat launch at Tupper Lake, we cannot agree with petitioners’ claim that the project will have an undue adverse impact on this public facility (see Executive Law § 805 [4] [c] [2] [a], [b]). Record evidence established that the Tupper Lake boat launch has not, in recent years, been regularly used to its full capacity, and petitioners’ claim that the project’s residents and guests would use 47 of 48 available launching windows each day is unsupported in the record. Nor does this estimate take into account all of the potential launching that might occur on any given day, as there was evidence that up to 55 boats have been launched from the Tupper Lake boat launch on peak days. Further, there was no evidence that the individuals using the valet service would take precedence over any other members of the public wishing to use the boat launch. We also reject as meritless petitioners’ contention that the valet service constitutes a commercial use of the boat launch by a private entity on Forest Preserve land. Rather, the launching and boarding of boats by the valet service will permit the project’s residents and guests to use the boat launch in the same manner as any other member of the public.
E. Fiscal Impact
Petitioners also argue that the developers’ projected real estate sales will not actually occur and that the developers did *76 not prove that one of their proposed funding sources, the Franklin County Industrial Development Agency (hereinafter FCIDA), is legal. Petitioners assert that, as a result, the APA’s determination approving the permit application should be annulled because the developers failed to prove that the project would not have an undue adverse fiscal impact on local governments. Again, we are not persuaded.
To be sure, the ability of local government to provide supporting services and facilities and the effect of development on local taxes are development considerations to be considered by the APA before granting a permit (see Executive Law §§ 805 [4] [c] [2] [b]; [4] [d], [e]; 809 [10] [e]). Nevertheless, despite the testimony of petitioners’ witness that the developers’ market research study was inadequate, the project was not competitive within its market and it had a lower probability of success than most competitor resorts, there was also evidence that the project is viable, it will be an economic engine for the region and, despite the recent downturn in the real estate market, the developers’ projected real estate sales numbers were achievable if the vacation home real estate market continues its current recovery. Thus, substantial evidence supports the APA’s conclusion that sufficient revenue would flow from the project to the local municipalities and, significantly, that such revenues would exceed the costs incurred by municipalities as a result of the project at the conclusion of each year of development.
Although petitioners also contend that the lack of certainty with respect to proposed funding from FCIDA is another basis for annulling the APA’s determination, the developers offered evidence that they plan to fund the project, including infrastructure costs, through a combination of private indebtedness, proceeds from sales, developer equity and revenue from FCIDA revenue bonds. They demonstrated that the project is phased in a manner to minimize risk by using the proceeds from initial real estate sales to fund the project’s later construction phases. There was further evidence that certain costs that might ordinarily be borne by the local municipalities will be funded out of other sources, including homeowners’ association fees. Accordingly, there is substantial evidence that, even if the developers were to default on the FCIDA bonds, there would be minimal risk to the local municipalities and, thus, we will not disturb the APA’s determination that the project would not cause undue adverse fiscal impacts to the local governments.
*77 II. Procedural Challenges
A. Findings of Fact
Also without merit is petitioners’ argument that the APA failed to make detailed findings of fact, supported by specific references to the record, as to how the project complied with the statutory criteria. The order approving the project contains over 100 findings of fact, followed by the APA’s conclusions of law. Within these findings is support for each of the enumerated criteria of Executive Law § 809 (10) and the APA’s ultimate conclusion that, upon compliance with the terms and conditions of the order and permits, the project “complies with the applicable approval criteria.” Additionally, inasmuch as “[t]he making of findings of fact [by the APA] shall constitute a ruling upon each finding proposed by the parties” (9 NYCRR 580.18 [c]; see State Administrative Procedure Act § 307 [1]), we reject petitioners’ claim that the APA was required to explicitly rule on any proposed findings of fact that may have been implied in their submittals.
B. Hearing Record
Petitioners’ assertion that the APA’s staff improperly provided the APA members with summaries of the hearing record without giving the parties an opportunity to comment is unwarranted. The aid and advice staff fulfilled their role of assisting the members with respect to the numerous issues being deliberated upon by providing a visual presentation based on record evidence, as well as a memorandum addressing the issue of the project’s financial impacts, during their public deliberations (see 9 NYCRR 580.18 [b]). Petitioners were fully aware of the presentation of these summaries, yet they failed to make any written comment with respect to their completeness and cannot argue that they were refused the opportunity to do so (compare Matter of Green Is. Assoc. v Adirondack Park Agency, 178 AD2d 860, 862-863 [1991]).
C.“In Existence” Status
Nor did the APA fail to adhere to the rules required for the project to achieve “in existence” status. Pursuant to the Adirondack Park Agency Act, a development project is “[i]n existence” when it “has been substantially commenced” (Executive Law § 802 [25] [a]), and a project for which a permit has been granted must be “in existence” within two years of the recording of the permit (see Executive Law § 809 [7] [c]). This *78 time period may be extended, however, upon consideration of “the potential of the land ... to remain suitable for the use allowed by the permit and to the economic considerations attending the project” (Executive Law § 809 [7] [c]). Here, the APA extended the project’s “in existence” time period to 10 years from the date of issuance of the final order and determined that it will consider this project to be in existence upon conveyance of the first residential building lot authorized by a permit. Inasmuch as the APA explained that the developers must complete a substantial amount of work and expend a significant amount of resources before any lot can be conveyed on the project site, and the statute permits an extension of the two-year period, we cannot agree with petitioners’ claim that the APA committed an error of law.
D. Ex Parte Communications
Petitioners have also failed to establish, despite their contentions to the contrary, that any improper ex parte communications occurred between the APA members and the developers during the deliberative process. We note that there is no prohibition against communications between the APA hearing staff, which is not a party to the hearing (see 9 NYCRR 580.6 [a]), and the developers (see Matter of Concerned Citizens Against Crossgates v Flacke, 89 AD2d 759, 761 [1982], affd 58 NY2d 919 [1983]). Given the speculative nature of petitioners’ claims, the sworn denials by respondents of any improper conduct and the absence of any affirmative proof of ex parte communication, we decline to annul the APA’s determination on this basis (see Matter of Regan v New York State & Local Employees’ Retirement Sys., 14 AD3d 927, 930 [2005], lv denied 4 NY3d 709 [2005], lv dismissed 5 NY3d 824 [2005]). Nor did Supreme Court abuse its discretion in denying petitioners’ motion for leave to conduct further discovery and in finding that their interest in pursuing additional evidence did not outweigh the burdens associated with the broad disclosure that they seek (see Matter of Lally v Johnson City Cent. Sch. Dist., 105 AD3d 1129, 1132 [2013]; Matter of Held v State of N.Y. Workers’ Compensation Bd., 103 AD3d 1063, 1064 [2013]; Matter of Morris Bldrs., LP v Empire Zone Designation Bd., 95 AD3d 1381, 1385 [2012], affd 21 NY3d 233 [2013]).
E. Costs and Fees
Inasmuch as petitioners are not the prevailing party, we must deny their request for an award of legal fees and expenses (see *79 CPLR 8602 [f]; Matter of Waverly Assoc. v New York State Div. of Hous. & Community Renewal, 12 AD3d 272, 275 [2004]).
Petitioners’ remaining contentions, to the extent that we have not specifically addressed them, have been considered and found to be without merit.
Lahtinen, J.P, McCarthy, Egan Jr. and Lynch, JJ., concur.
Adjudged that the determination is confirmed, without costs, and petition dismissed. Ordered that the order is affirmed, without costs.

. Additionally, in 2009, this Court affirmed the dismissal of an earlier CPLR article 78 proceeding brought by, among others, two predecessor organizations of petitioner Protect the Adirondacks! Inc. to challenge the Town of Tupper Lake’s rezoning of land as a precursor step for the project (see Matter of Association for the Protection of the Adirondacks, Inc. v Town Bd. of Town of Tupper Lake, 64 AD3d 825 [2009]).

. Employees of the APA were involved in the adjudicatory hearing as well. Certain staff, designated as “hearing staff,” were charged with advocating for a complete record. Although not considered a party to the hearing, these staff members presented their own evidence regarding the project’s impacts (see 9 NYCRR 580.6 [a]). Other APA employees, known as “aid and advice staff,” were assigned to assist the APA voting members throughout the proceeding and deliberations (see 9 NYCRR 580.18 [b]).

. Contrary to the developers’ assertion, inasmuch as two of the individual petitioners, who are members of petitioner Sierra Club, are nearby landowners who regularly enjoy the Adirondack Park’s natural resources and have sufficiently alleged direct harm to their “[a]esthetic and environmental well-being” (Sierra Club v Morton, 405 US 727, 734 [1972]), we find that the Sierra Club has standing to challenge the APA’s determination in this proceeding (see Matter of Save the Pine Bush, Inc. v Common Council of City of Albany, 13 NY3d 297, 304-306 [2009]).

. Some examples of compatible development in moderate intensity land use areas include private sand and gravel extractions, commercial uses, tourist attractions, ski centers and industrial uses (see Executive Law § 805 [3] [d] [4]).

. The use of Tupper Lake was estimated to cost the developers more than $3 million, while Cranberry Pond would cost less than $600,000.

. The ski area permit limits withdrawals from Cranberry Pond to five consecutive years, and can be terminated in as soon as two years should monitoring reports indicate that the withdrawals substantially impair wetlands functions, including impacts related to wildlife. The required biological survey and impact analysis must be multi-season and continue over at least two years.

. The APA has statutory authority to review and approve projects involving freshwater wetlands that are within the Adirondack Park (see ECL 24-0801 [2]; see also ECL 24-0511; 9 NYCRR part 578).

. Key wildlife habitats are defined as those “required for the survival of wildlife species which are characteristic of the northern hardwood and coniferous forests of the Adirondack Park, many of which are unique ... or rare or endangered within the State” (9 NYCRR 574.5 [a] [5] [iii] [b]).

. Petitioners claim that it was error for the APA to rely on its internal guidelines with respect to the adequacy of the site investigations. They have not identified any prejudice, however, and, in any event, we cannot conclude that reliance on the guidelines resulted in “ ‘such a harmful or unfair effect as to vitiate the hearing’ ” (Matter of Multari v Town of Stony Point, 99 AD2d 838, 839 [1984], quoting Matter of Erdman v Ingraham, 28 AD2d 5, 9 [1967]; accord Matter of Johnson v Town of Arcade, 281 AD2d 894, 895 [2001]).

. Although amphibian habitats were identified in some proposed development areas, the APA appropriately imposed protective measures as a condition of the permit for those areas. In addition, the APA required a comprehensive amphibian survey to determine whether any additional measures were required prior to construction. These conditions reflect the APA’s consideration of the appropriate criteria in approving the project.

. The other 579 residential units are located in higher intensity land use areas and are not challenged by petitioners.

. Inasmuch as Executive Law § 805 “serve[s] to guide land use planning and development throughout the . . . Adirondack [P]ark” (Executive Law § 805 [1] [a] [emphasis added]), we reject petitioners’ argument that the APA committed a legal error by concluding that this provision was not a mandatory rule, but a consideration to guide the APA’s exercise of its discretion.

. The overall intensity guidelines for resource management lands allow for 15 principal buildings per square mile, or one principal building for every 42.7 acres of land (see Executive Law § 805 [3] [g] [3]).