■ In the Matter of RIVERKEEPER, INC., Appellant, v NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION et al., Respondents. (And Another Related Proceeding.) [59 NYS3d 806]—

Devine, J. Appeal from a judgment of the Supreme Court (McDonough, J.), entered January 26, 2016 in Albany County, which dismissed petitioner's applications, in two combined proceedings pursuant to CPLR article 78 and actions for declaratory judgment, to, among other things, review a determination of respondent Department of Environmental Conservation granting respondent Danskammer Energy, LLC certain permits to operate a natural gas electric generating station.

The Danskammer Generating Station (hereinafter the station) uses four steam turbine generators to produce electricity. The station is located on the shore of the Hudson River and employs a "once-through cooling system" to prevent the generating units from overheating, a process wherein water is pumped from the river to cool the units and then returned to the river at a higher temperature. This discharge of warmer water is a pollutant under federal and state law (*see* 33 USC §§ 1326, 1362 [6]; ECL 17-0105 [17]) and, as such, requires a State Pollutant Discharge Elimination System (hereinafter SPDES) permit issued by respondent Department of Environmental Conservation (hereinafter DEC) (*see* ECL 17-0701, 17-0801 *et seq.*; *see also Matter of Riverkeeper, Inc. v Crotty*, 28 AD3d 957, 957 [2006]). The station is also a source of hazardous air pollutants within the meaning of the federal Clean Air Act (*see* 42 USC § 7412) that requires an additional permit, known as a "Title V" permit, issued by DEC (*see* 42 USC § 7661 *et seq.*; ECL 19-0311).

The station's SPDES permit was set to expire in 2011, but remained in effect due to a pending renewal application (*see* State Administrative Procedure Act § 401 [2]). The then-owner of the station also filed for bankruptcy in 2011 and, as part of the bankruptcy proceedings, sought to sell the station at auction. A massive storm flooded the station and forced it offline in October 2012, prompting the then-owner to request authorization to quickly discontinue operation of the station and sell it to a bidder at auction that had an expressed intention of demolishing the station. Authorization to retire the station was granted by the Public Service Commission in April 2013, but the sale was never consummated and regulatory changes restored the station's financial viability. The station was then sold to a different entity that, in June 2014, was authorized by the Public Service Commission to resume operations at the station and transfer it to respondent Danskammer Energy, LLC (hereinafter Danskammer).

The ownership changes and passage of time resulted in applications to DEC for the issuance of updated operating permits, including SPDES and Title V permits. In August 2014, DEC published a combined notice of complete applications in which it noted its issuance of a negative declaration pursuant to the State Environmental Quality Review Act (*see* ECL art 8 [hereinafter SEQRA]) and the availability of draft SPDES and Title V permits. Following technical review and public comment, DEC granted final SPDES and Title V permits to Danskammer. Petitioner thereafter commenced two combined

proceedings pursuant to CPLR article 78 and actions for declaratory judgment seeking various relief, including annulment of the negative declaration under SEQRA and the final SPDES and Title V permits. Following joinder of issue, Supreme Court considered the two combined proceedings and actions together and dismissed them in a single judgment. Petitioner appeals, and we now affirm.

Contrary to petitioner's contention, DEC was not required to hold a public adjudicatory hearing prior to issuing final SPDES and Title V permits. It was incumbent upon DEC, after evaluating the permit applications and reviewing all comments submitted in response to them, to "determine whether or not to conduct a public hearing 'based on whether the evaluation or comments raise substantive and significant issues relating to any findings or determinations [DEC] is required to make . . . , including the reasonable likelihood that [the permits] will be denied or can be granted only with major modifications to the project' " (*Matter of Eastern Niagara Project Power Alliance v New York State Dept. of Envtl. Conservation*, 42 AD3d 857, 859 [2007], quoting ECL 70-0119 [1]; *see* 6 NYCRR 621.8). The ultimate burden rested on petitioner to show that its issues were "substantive and significant" enough to warrant a public hearing (6 NYCRR 624.4 [c] [4]; *see Matter of Eastern Niagara Project Power Alliance v New York State Dept. of Envtl. Conservation*, 42 AD3d at 859).

In that regard, while petitioner raised a number of concerns regarding the draft SPDES permit, it also acknowledged that the draft permit was largely identical to the existing permit (*see e.g. Matter of Riverkeeper, Inc. v Johnson*, 52 AD3d 1072, 1072-1073 [2008], *lv denied* 11 NY3d 716 [2009]), one that DEC noted had only been issued after extensive administrative proceedings and an adjudicatory hearing. Moreover, to the extent that the draft SPDES permit modified the terms of the prior permit, those modifications reduced the impact of the station upon the river. The objection to the Title V permit amounted to the rather obvious point that a station in service would create more atmospheric emissions than one offline. DEC issued a written response to petitioner's comments and, while it did make modifications as a result of the concerns raised, it gave no reason to believe that those concerns might have required extensive retooling of either permit or imperiled their issuance altogether. Accordingly, mindful as we are that our judgment should not be substituted for that of the agency, the determination that petitioner had failed to demonstrate the need for an adjudicatory hearing was not arbitrary and

capricious (see *Matter of Raritan Baykeeper, Inc. v Martens*, 142 AD3d 1083, 1085-1086 [2016]; *Matter of Eastern Niagara Project Power Alliance v New York State Dept. of Envtl. Conservation*, 42 AD3d at 861).

Turning to the merits of petitioner's challenges to the various permits, we reiterate that we do not "substitute [our] judgment for that of the agency responsible for making the determination, . . . [and] ascertain only whether there is a rational basis for the decision or whether it is arbitrary and capricious" (*Flacke v Onondaga Landfill Sys.*, 69 NY2d 355, 363 [1987]; *see Matter of Department of Envtl. Protection of City of N.Y. v Department of Envtl. Conservation of State of N.Y.*, 120 AD2d 166, 169 [1986], *lv denied* 69 NY2d 921 [1987]). As for the SPDES permit, petitioner claims that the discharge of warm water from the station will cause surface water temperature near the discharge point to occasionally exceed the regulatory maximum of 90 degrees Fahrenheit and threaten marine life (*see* 6 NYCRR 700.1 [a] [17]; 704.2 [b] [5] [i]). That being said, there is nothing inherently improper in "allow[ing] for ambient [temperature] above the criteria in small areas near outfalls" (EPA, Water Quality Standards Handbook: Second Edition at 5-1 [Aug. 1994], available at https://www.epa.gov/sites/production/files/2016-06/documents/wqs-handbook-1994.pdf [accessed July 13, 2017]). New York has adopted such a "mixing zone" policy (*see* 6 NYCRR 704.1 [b]; 704.3; *see also* 40 CFR 131.13), and such a zone will pass muster so long as it is defined in scope, does "not interfere with spawning areas, nursery areas and fish migration routes" (6 NYCRR 704.3 [c]) and avoids lethality "in contravention of water quality standards to aquatic biota which may enter" it (6 NYCRR 704.3 [b]). Lethality, for purposes of mixing zones, focuses upon the impacts of a mixing zone upon an entire population, not whether the water temperature in the zone will prove deadly to an individual organism (*see* 6 NYCRR 704.1 [a]; EPA, Water Quality Standards Handbook: Second Edition at 5-6 [Aug. 1994], available at https://www.epa.gov/sites/production/files/2016-06/documents/wqs-handbook-1994.pdf [accessed July 13, 2017]).

DEC had before it a report disclosing the results of a thermal survey of the defined mixing zone, conducted in 2005, finding that the zone would "accommodate [all] water greater than 90 [degrees Fahrenheit] at any point in time under all likely [station] operation scenarios and receiving water conditions while respecting" the requirements of 6 NYCRR 704.3. In reaching that conclusion, the survey found that maximum temperatures only had the potential to be excessive during the summer

months and, even then, would do so in shifting portions of the mixing zone and would have no impact upon bottom-dwelling organisms where the temperature would be lower.* DEC further noted that most fish in the area did not spawn during the summer months and that juvenile and adult fish are capable of detecting and avoiding water hot enough to stress them. The foregoing constitutes a rational basis from which DEC could conclude that the mixing zone complies with 6 NYCRR 704.3.

With regard to the Title V permit, petitioner argues that the permitting process demanded a new source review, defined as "a pre-construction review to determine the appropriate air pollution controls" for a new or modified major stationary source of air pollution (Part 231 New Source Review for New and Modified Facilities Frequently Asked Questions, NYS Department of Environmental Conservation, available at http://www.dec.ny.gov/chemical/63396.html [accessed July 13, 2017]; *see* 6 NYCRR part 231). DEC held that the review was not required here because the application involved "[t]he reissuance, recertification or extension of any permit for previously approved activities which will be continued on the same site without material change" (6 NYCRR 201-2.1 [b] [26]). "[R]eactivation of a permanently shutdown facility will be treated as operation of a new source" for purposes of a new source review, however, and petitioner asserts that the station had been permanently shut down in the wake of its closure due to storm damage (*Matter of Monroe Electric Generating Plant Entergy Louisiana, Inc., Proposed Operating Permit*, Petition No. 6-99-2, EPA Order at 8 [1999], available at https://www.epa.gov/sites/production/files/2015-07/documents/ccaw_ord.pdf [accessed July 13, 2017]).

The question of "whether or not a shutdown should be treated as permanent depends on the intention of the owner or operator at the time of shutdown based on all facts and circumstances" (*Matter of Monroe Electric Generating Plant Entergy Louisiana, Inc., Proposed Operating Permit*, Petition No. 6-99-2, EPA Order at 8), including "the amount of time the facility has been out of operation, the reason for the shutdown,

---

* Any thermal discharge must also "assure the protection and propagation of a balanced, indigenous population of shellfish, fish, and wildlife in and on the body of water" into which the discharge occurs, and petitioner argues that such was not the case here (6 NYCRR 704.1 [a]). Petitioner's argument flies in the face of record proof such as the results of a 1978 study of the thermal discharge's effect on fish, the 2005 thermal survey and ongoing river monitoring, all of which reflect that the discharge does not pose a problem to maintaining a balanced, indigenous population of aquatic life in the Hudson River.

statements by the owner or operator regarding intent, cost and time required to reactivate the facility, status of permits, and ongoing maintenance and inspections that have been conducted during shutdown" (*Matter of Monroe Electric Generating Plant Entergy Louisiana, Inc., Proposed Operating Permit*, Petition No. 6-99-2, EPA Order at 9). The station here was shut down due to storm damage beyond the operator's control and, following a period of standard maintenance and storm-related repairs, resumed operation less than two years later. The operator of the station continued to maintain the various permits required to run it and, indeed, applications to renew those permits lie at the heart of these proceedings. Moreover, while the former owner sought permission to sell the station to a winning auction bidder that intended to demolish it, the sale never occurred and was abandoned once the financial and regulatory situation made continued operation of the station viable. DEC rationally concluded, as a result, that there was no intent to permanently shut down the station and that new source review was not required.

Petitioner's final contention is that DEC failed to comply with the requirements of SEQRA in finding that the permit renewals would have no significant effect upon the environment and issuing a negative declaration. DEC observed that the station's environmental impacts were not new—notwithstanding the puzzling insistence of petitioner that the station's brief shutdown warranted treating them as such—and that the issuance of modified renewed permits would lessen the existing impacts by, among other things, eliminating coal as a fuel source for the station's turbines. It is accordingly evident that DEC "identified the relevant areas of environmental concern, took a hard look at them, and made a reasoned elaboration of the basis for its determination" (*Matter of Chinese Staff & Workers' Assn. v Burden*, 19 NY3d 922, 924 [2012] [internal quotation marks and citations omitted]). Thus, we are satisfied that DEC satisfied its statutory responsibilities under SEQRA when it issued the negative declaration.

Egan Jr., J.P., Lynch, Clark and Aarons, JJ., concur. Ordered that the judgment is affirmed, without costs.