Matter of Lake George Assn. v NYS Adirondack Park Agency (2024 NY Slip Op 02356)

Matter of Lake George Assn. v NYS Adirondack Park Agency

2024 NY Slip Op 02356

Decided on May 2, 2024

Appellate Division, Third Department

Fisher, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:May 2, 2024

CV-23-0672

[*1]In the Matter of The Lake George Association et al., Respondents,
v
NYS Adirondack Park Agency et al., Appellants.

Calendar Date:March 27, 2024

Before: Egan Jr., J.P., Aarons, Pritzker and Fisher, JJ.

Letitia James, Attorney General, Albany (Joshua M. Tallent of counsel), for appellants.
The West Firm, PLLC, Albany (Thomas S. West of counsel), for respondents.

Fisher, J.
(1) Appeal from a judgment of the Supreme Court (Robert J. Muller, J.), entered March 3, 2023 in Warren County, which granted petitioners' application, in a proceeding pursuant to CPLR article 78, to annul a determination of respondent Adirondack Park Agency approving permits for the application of ProcellaCOR EC in Lake George, and (2) motion to strike portions of respondents' reply brief.
Respondent Adirondack Park Agency (hereinafter the APA) is deputized with advancing "optimum overall conservation, protection, preservation, development and use of the unique scenic, aesthetic, wildlife, recreational, open space, historic, ecological and natural resources of the Adirondack park" (Executive Law § 801). Such prescription includes the regulation of wetlands within the Adirondack park and, as such, permits for the application of pesticides and other chemicals must be issued by the APA pursuant to the Freshwater Wetlands Act (see ECL 24-0801; 9 NYCRR 578.2 [a]; 578.8 [i]). Respondent Lake George Park Commission (hereinafter the LGPC) is responsible for the management of Lake George and surrounding park areas including the wetlands situated therein (see ECL 43-0101), and is located within the Adirondack park and, therefore, within the purview of the APA.
In this capacity, the LGPC has conducted extensive removal and remediation projects targeting Eurasian watermilfoil (hereinafter EWM), an aquatic invasive plant that was first identified in Lake George during the 1980s, which is not native to the United States, has no natural predators and negatively impacts recreational use of the waterbody, water quality and native flora and fauna. This aggressive plant is very difficult to eradicate and control for a variety of factors, notably because EWM can reestablish from roots that were not completely pulled or killed, or through fragmentation, whereby pieces of severed plant spread in the water and propagate elsewhere in the lake, thus exacerbating the infestation. Removal projects have included the use of benthic matting/barriers over EWM beds, which have proven effective at smothering and containing EWM, but which are also indiscriminate killers of other native aquatic plants and may also harm animals living in or on the lakebed being covered. Hand harvesting is another removal method, including the use of a multi-person crew and a Diver Assisted Suction Harvester (hereinafter DASH), whereby a diver identifies and removes the entire plant from its roots by hand, and then places it into an underwater suction tube attached to a filtration system on a topside vessel that separates EWM for disposal. Despite being generally effective and causing less collateral damage to native species than matting, DASH is expensive and time consuming, resultantly limiting the number and area of removal projects that can be undertaken in a given year, while having only a temporary impact due to EWM's ability to quickly repopulate disturbed areas. Although such efforts to eradicate [*2]EWM from Lake George have cost the LGPC hundreds of thousands of dollars every year and approximately $7 million in total, there has been limited success on the global impact of the EWM population in Lake George.
In February 2021, following years of using benthic mat and hand harvesting removal methods, the LGPC requested a preliminary consultation and informal assessment from the APA regarding the application of a herbicide, ProcellaCOR EC (hereinafter ProcellaCOR), as a new method for EWM remediation within Lake George, specifically in Sheep Meadow Bay and Blairs Bay in the Town of Hague, Warren County. This herbicide was previously approved for such purpose by both the federal Environmental Protection Agency (hereinafter EPA) and respondent New York State Department of Environmental Conservation (hereinafter DEC). In July 2021, the APA wetlands staff performed site visits of the proposed project locations and ultimately determined that Blairs Bay was a value one wetland and Sheep Meadow Bay was a value three wetland.[FN1] Thereafter, the LGPC submitted permit applications and supporting materials for the use of ProcellaCOR in both bays. Following a request for additional studies and supporting materials, the APA deemed each permit application complete on March 3, 2022, complied with its notice obligations, and further advised that public comments would be accepted through March 31, 2022. During this time, DEC completed its independent review and issued two separate permits authorizing the use of ProcellaCOR in both bays, subject to approval by the APA.
By the close of the public comment period, the APA timely received a total of 318 submissions relating to the permit applications, with 22 in support of the herbicide proposal and 296 letters in opposition. The majority of the opposition letters were form submissions — some with additional personal statements — pursuant to a letter-writing campaign at the behest of petitioner The Lake George Association (hereinafter LGA).[FN2] Of the opposition letters, there were two notable and relevant submissions; one being a joint letter between LGA and petitioner Lake George Waterkeeper (hereinafter Waterkeeper), and the second submission from a limnologist with a dedication to specifically studying Lake George. Such comments were ultimately posted on the public website by the APA, whereafter the executive director of the LGPC submitted a response to the APA. Thereafter, the APA staff analyzed the project and determined that the applications met all applicable standards and would have no undue adverse wetland or other impacts, and presented such findings before the APA board at a public meeting on April 14, 2022. During such meeting, it was represented to the members of the APA board that, due to the regulatory time constraints, the APA board was required to decide whether to hold an adjudicatory hearing on such date. Following a discussion, including where several members expressed the opinion that they felt the [*3]applications were being rushed or contained inadequate information to make a decision without a hearing, the APA board granted both permit applications in a vote of six members in support and four members in opposition. Accordingly, permits for the use of ProcellaCOR in Blairs Bay and Sheep Meadow Bay were issued to the LGPC on April 22, 2022, specifying, among certain other conditions, that such treatment must occur by June 30, 2022.
Petitioners, a collection of public interest entities and an adjoining property owner to the project at Sheep Meadow Bay, commenced this proceeding pursuant to CPLR article 78, seeking to annul the permits issued by the APA. Petitioners asserted eight causes of action, generally taking issue with the procedure utilized by the APA in approving the permits and the failure to conduct an adjudicatory hearing. At the same time, petitioners moved for a preliminary injunction preventing the application of ProcellaCOR during the litigation, which was opposed by respondents and granted by Supreme Court. Following joinder of issue by respondents, Supreme Court found that "it does not appear that the [APA] board had sufficient information" to consider possible alternative methods of EWM remediation instead of ProcellaCOR or to determine whether to hold an adjudicatory hearing, largely due to the APA staff presentation being rushed, inaccurate and one-sided; Supreme Court held — although acknowledging there were no directives stating otherwise — that staff presentations were "presumably" required to be "balanced and impartial," and therefore granted the petition in its entirety,[FN3] vacating the permits issued by the APA. Respondents appeal.
Initially, petitioners move to strike a footnote from respondents' reply brief on the ground that it contains matters that are outside the scope of the administrative record. Specifically, petitioners take issue with the assertion that "adjudicatory hearings have become rare because, where the [APA] makes clear to an applicant — often through requests for additional information — that a project is unlikely to be approved without a formal hearing, the applicant typically redesigns the project or withdraws or abandons the application rather than face the expense and delay of such a hearing." Respondents contend that such footnote was in response to petitioners' nonrecord statements that the APA has taken an "anti-hearing" stance for more than a decade, a point respondents contend is also outside the scope of the administrative record. Although this Court's review is limited to reviewing facts contained in the record (see Matter of Jorling v Adirondack Park Agency, 214 AD3d 98, 101-102 [3d Dept 2023]), we find that respondents' footnote was a permissible statement and argument encompassing the applicable statutory and regulatory authorities governing the handling of an incomplete permit application (see Reed v New York State Elec. & Gas Corp., 183 AD3d 1207, 1209 [3d Dept 2020]; see also Executive [*4]Law § 809 [2] [b]; 9 NYCRR 572.7, 572.22 [a] [1] [i]). To the further extent that petitioners contend that their counsel raised this point before Supreme Court during oral argument — which is also not part of the administrative record — such admission demonstrates that respondents' footnote was also a permissible response to petitioners' prior contentions and nonrecord statements (see Reed v New York State Elec. & Gas Corp., 183 AD3d at 1209). Accordingly, we deny petitioners' motion to strike.[FN4]
Turning to the merits, where an agency's determination was rendered without a fact-finding hearing, a court's review is limited to "whether [the] determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion" (CPLR 7803 [3]; see Matter of Adirondack Wild: Friends of the Forest Preserve v New York State Adirondack Park Agency, 34 NY3d 184, 191 [2019]). In performing such review, "[i]t is well settled that a court cannot substitute its view of the factual merits of a controversy for that of the administrative agency" (Matter of North Shore Ambulance & Oxygen Serv. Inc. v New York State Emergency Med. Servs. Council, 200 AD3d 1527, 1530 [3d Dept 2021] [internal quotation marks, brackets and citation omitted]). And, when "the judgment of the agency involves factual evaluations in the area of the agency's expertise and is supported by the record, such judgment must be accorded great weight and judicial deference" (Matter of Beer v New York State Dept. of Envtl. Conservation, 189 AD3d 1916, 1918 [3d Dept 2020] [internal quotation marks and citations omitted]). Indeed, "[i]f a determination is rational it must be sustained even if the court concludes that another result would also have been rational" (Matter of Adirondack Wild: Friends of the Forest Preserve v New York State Adirondack Park Agency, 34 NY3d at 195 [internal quotation marks and citation omitted]; see Matter of Natasha W. v New York State Off. of Children & Family Servs., 32 NY3d 982, 984 [2018]).
Although an agency acts arbitrarily and capriciously when it fails to conform to its own regulations, an agency's interpretation of its own regulations is entitled to deference if that interpretation does not contradict the plain language of the regulations and is not irrational or unreasonable (see Matter of Jorling v Adirondack Park Agency, 214 AD3d at 103; Matter of Advanced Therapy, OT, PT, SLP, Psychologist, Registered Professional Nurse [RN], PLLC v New York State Educ. Dept., 140 AD3d 1367, 1368 [3d Dept 2016], appeal dismissed & lv denied 28 NY3d 1058 [2016]). As relevant here, the use of an aquatic herbicide in a freshwater wetland is a regulated activity requiring a permit to be issued by the APA so long as it concludes that the proposed activity "would not have an undue adverse impact upon the natural, scenic, aesthetic, ecological, wildlife, historic, recreational or open space resources of the [Adirondack] park[*5], taking into account the economic and social or other benefits to be derived from the activity" (ECL 24-0801 [2]; see 9 NYCRR 578.2 [a]; 578.3 [n] [2] [i]; 578.8 [i]; 578.9). In issuing such a permit, the APA must make a set of findings indexed to the value rating of the affected wetland (see 9 NYCRR 578.10 [a] [1], [3]), but may depart from those findings where "the economic, social and other benefits to be derived from the activity proposed compel a departure" (9 NYCRR 578.10 [a]; see 9 NYCRR 578.9).
Here, the APA board members were provided with an extensive meeting packet including, among other things, the timely-submitted public comments, various reports and findings from DEC and the Department of Health (hereinafter the DOH), a study of ProcellaCOR use in Lake Minerva for 2020 and other information relating to the permit applications. The APA board was also forwarded via email two late public comments from the limnologist and Waterkeeper.[FN5] The APA staff specifically referenced or otherwise incorporated these materials, initially discussing the destructive characteristics of EWM and how it harms native vegetation and affects aquatic animals, notably because it grows fast and dense, and typically begins growing earlier in the season than other native plants such as the threatened alternate-flowered watermilfoil (hereinafter AFWM). Staff also explained that EWM beds typically die off quickly at the end of the season, further reducing available oxygen in the water while increasing the possibility of harmful algal blooms. In combating EWM in Lake George, staff discussed the advantages and disadvantages of benthic matting and hand harvesting with DASH. Such discussion included a comparison with Upper Saranac Lake, where aggressive remediation efforts using DASH have been able to successfully keep the EWM populations at "manageable levels." In doing so, however, staff highlighted that more than $75,000 had been spent annually to manage EWM in Upper Saranac Lake, whereas Lake George is much larger and it was expected to cost nearly $35,000 per week during the season to continue with DASH. Despite this significant cost and harvesting 68 tons of EWM in 2021, EWM populations in Lake George would still not be at manageable levels, as it was further acknowledged that regrowth rates in those DASH-managed areas were as high as 40% in the following season and they would need to be managed again within two years.[FN6]
As a result of the combination of the lack of global effectiveness and the high cost of using DASH in Lake George, the LGPC was limited in the number of areas and the extent of efforts that could be made each year to treat the EWM infestation.
In considering the LGPC's request to use ProcellaCOR, staff reviewed and presented to the APA board certain scientific findings from studies, research and reports. As it relates to the herbicide itself, the active ingredient in ProcellaCOR [FN7] is a type of synthetic plant hormone that mimics the plant growth [*6]hormone auxin, resulting in the disruption of the growth process in susceptible plants by causing excessive elongation of plant cells, ultimately killing the plant. It is a systemic herbicide, meaning that it is absorbed by the plant and distributed throughout the plant's stem, leaves and roots, rendering all parts of it nonviable, ensuring that EWM cannot spread through fragmentation. Notably, ProcellaCOR requires only a short contact time (between two and six hours) and rapidly degrades in sunlight. According to research from the EPA [FN8] and DEC, including reviews from the DOH and from DEC's Division of Fish and Wildlife, studies into the toxicity of ProcellaCOR determined that acute and chronic exposure was "practically non-toxic" to fish, birds, mammals, bees, amphibians and reptiles.[FN9] Although ProcellaCOR was determined to be slightly toxic to invertebrates, notably to the freshwater midge, such finding was based on chronic exposure and not acute exposure.[FN10] As more specifically relating to humans, based on the maximum concentration permitted to control EWM, which is 7.72 parts per billion (ppb), there were no restrictions to swimming, contact recreation or fishing, and irrigation restrictions were to continue until there was less than 1 ppb detected. There were also no drinking water restrictions because the DOH has no restrictions under 50 ppb, and the maximum application of ProcellaCOR in either bay was permitted to only be up to 7.72 ppb. Following these details, the staff discussed the results from the ProcellaCOR treatment in Minerva Lake, a value one wetland like Blairs Bay, which occurred in 2020 and demonstrated that the herbicide worked exactly as studied and expected. This specifically included how the herbicide quickly degraded to undetectable levels in just three days, almost entirely eradicated EWM in the entire lake,[FN11] and in the year following the treatment, vegetation density levels returned to pretreatment levels, therefore indicating that native species were able to rebalance the ecosystem as intended. Similar results from ProcellaCOR projects in New Hampshire and Vermont were acknowledged by staff.
As it specifically relates to Sheep Meadow Bay, staff explained that the total area of treatment would be 3.6 acres and included a 40-acre dilution zone. Within this area, four native types of watermilfoil were noted as present and susceptible to ProcellaCOR — including the threatened species AFWM. Relating to Blairs Bay, the treatment zone would be 4 acres with a 60-acre dilution zone, and additional native species were also noted as present and susceptible — again including AFWM. Based on their review and that of DEC, staff told the APA board that they are presuming the application of ProcellaCOR would kill susceptible species in the treatment locations and possibly also in the dilution zones, but had hope that, since EWM begins to grow earlier in the season than many of these species such as AFWM, that an early season application [*7]could minimize or avoid harming native species. It was further noted that, although AFWM is threatened in New York, there are at least 35 other locations in Lake George where AFWM has been observed. Lastly, the proposed treatment project would cost $39,330.
Thereafter, staff discussed the public comments, including a concern raised regarding when EWM beds would be rapidly killed off by the herbicide and the plants would decompose all at the same time, thereby causing an excess release of nutrients and creating a risk of harmful algal blooms. However, staff explained that this risk is actually higher when EWM beds are not treated and are allowed to fully grow for a season and then die off, as opposed to applying the herbicide earlier in the season when EWM beds would be in their infancy and relatively small. Relating to rare native species and other nontarget species, staff reiterated that they assumed all susceptible species would be impacted by the treatment but that each species was secure throughout Lake George. Relating to comments suggesting a return to hand harvesting and benthic matting, including that such efforts have not been performed in Sheep Meadow Bay and limited in Blairs Bay over the past years, staff reiterated that the LGPC has to triage sites and cannot focus on all locations but rather must prioritize larger infestations and higher traffic areas — notably where boat traffic could accelerate fragmentation. Staff also acknowledged that officials from petitioner Town of Hague passed a unanimous resolution opposing the use of ProcellaCOR in either bay. Following the staff recommendations relating to the project and imposing certain conditions, one APA board member indicated that she did not believe that she had enough information,[FN12] which was echoed by two other board members — including one who was also concerned about the unanimous resolution by the Town of Hague.
Based on the foregoing, although it may have been rational for the APA board to vote differently based on the information before it, we cannot say that the APA lacked a rational basis or acted in an arbitrary and capricious manner in approving the permit applications (see Matter of Adirondack Wild: Friends of the Forest Preserve v New York State Adirondack Park Agency, 34 NY3d at 195; Matter of Riverkeeper, Inc. v New York State Dept. of Envtl. Conservation, 152 AD3d 1016, 1019 [3d Dept 2017]). The information before the APA board contained scientific studies, reports and research indicating that ProcellaCOR is "practically non-toxic" to nearly all animals including fish and humans, with the exception of being slightly toxic to certain invertebrates like the freshwater midge and mysid. Although the limnologist raised concerns over these toxicity findings,[FN13] as did the EPA over male freshwater midges, the limnologist also conceded that certain testing relating to the toxicity of ProcellaCOR to female mysids was statistically insignificant. As it relates to her remaining [*8]contentions and those of Waterkeeper, including challenges to the dilution models, circulation/currents of the lake and degradation of the active ingredient and its metabolites, responses by the executive director of the LGPC, discussions during the APA presentation and the other materials in the meeting packet were sufficient to allow APA board members to rationally disagree with those contentions (see Matter of Catskill Heritage Alliance, Inc. v New York State Dept. of Envtl. Conservation, 161 AD3d 11, 19 [3d Dept 2018], lv denied 32 NY3d 904 [2018]). When further considering the economic, social and other benefits derived from the use of ProcellaCOR — specifically, that the total treatment proposal cost for the project would be slightly more than the cost of just one week of continuing DASH, and that the successful results of other treatment projects such as in Minerva Lake demonstrated that the use of ProcellaCOR was efficient and minimally harmful — we are satisfied that the APA complied with its statutory and regulatory duties and was not otherwise required to present more alternatives in the permit review process (see ECL 24-0801 [2]; 9 NYCRR 578.2 [a]; 578.3 [n] [2] [ii]; 578.8 [i]; 578.9; 578.10 [a] [1], [3]; see Matter of Beer v New York State Dept. of Envtl. Conservation, 189 AD3d at 1920-1921; see generally Matter of Protect the Adirondacks! Inc. v Adirondack Park Agency, 121 AD3d 63, 77 [3d Dept 2014], lv dismissed & denied 24 NY3d 1065 [2014]). Accordingly, it was an error for Supreme Court to substitute its judgment for that of the APA in determining whether there was sufficient information to approve the permit applications — particularly when according great weight and judicial deference to the factual evaluations of the APA within its area of expertise (see Matter of Riverkeeper, Inc. v New York State Dept. of Envtl. Conservation, 152 AD3d at 1019; see also Matter of Beer v New York State Dept. of Envtl. Conservation, 189 AD3d at 1918).
In addition, contrary to petitioners' contentions, the record also supports the APA's determination to not hold a hearing on either permit application. In challenging such determination, the ultimate burden is on petitioners to demonstrate that there were "substantive and significant issues" with respect to whether the proposed project would have an "undue adverse impact on the natural, scenic, aesthetic, wildlife, historic, recreational or open space resources" of the Adirondack park (Executive Law § 809 [3] [d]; [10] [e]; see Matter of Adirondack White Lake Assn. v Adirondack Park Agency, 225 AD3d 1247, 1248, 2024 NY Slip Op 01621, *2 [4th Dept 2024]; Matter of Riverkeeper, Inc. v New York State Dept. of Envtl. Conservation, 152 AD3d at 1018). "The resolution of whether an issue is substantive and significant requiring an adjudicatory hearing is left to [the APA] and will not be disturbed absent a showing that it is predicated upon an error of law, is arbitrary and capricious, or represents an [*9]abuse of discretion" (Matter of Beer v New York State Dept. of Envtl. Conservation, 189 AD3d at 1920 [internal quotation marks and citations omitted]).
Here, although public commenters expressed a desire for further studies, which was echoed by a few APA board members, the record is unclear how these studies would have been different than what information was already before board members and how such studies would have helped them make a decision — specifically as it relates to toxicity to invertebrates, as the EPA found ProcellaCOR to be only slightly toxic and the limnologist acknowledged other findings suggesting chronic toxicity to be statistically insignificant (see Matter of Adirondack Wild: Friends of the Forest Preserve v New York State Adirondack Park Agency, 34 NY3d at 197). Other individual board members acknowledged that more information would be better, but also expressed that they felt comfortable as to the information before them to vote on the permit applications. Relating to public interest in the projects, despite there being approximately 300 public comments in opposition to the proposed project, the majority of these submissions were from a letter-writing campaign by one of the petitioners and constituted less than 10% of its total membership, which alone is insufficient to warrant a hearing (see Matter of Adirondack White Lake Assn. v Adirondack Park Agency, 225 AD3d at 1248 [affirming denial of request for adjudicatory hearing where record contained over 3,000 submissions in opposition to the proposed project]; NY St Cts Elec Filing [NYSCEF] Doc No. 197, respondent's brief at 7, in Adirondack White Lake Assn. v Adirondack Park Agency, Sup Ct, Oneida County, index No. EFCA2022-556, affd 225 AD3d 1247 [4th Dept 2024]). To the extent that petitioners highlight the APA's handling of the SONAR herbicide applications from nearly two decades ago, which are nonbinding on the APA and this Court, such applications involved a different herbicide with different risks, required prolonged contact lasting for six weeks, and necessitated containment curtains to maintain such contact between the target vegetation and the herbicide — factors that are absent here. When further considering the record, public interest and other criteria that the APA should consider when determining whether to hold an adjudicatory hearing (see Executive Law § 809 [3] [d]; 9 NYCRR 580.2 [a]), and "mindful that our role is not to reweigh the factors and substitute our judgment" (Matter of Catskill Heritage Alliance, Inc. v New York State Dept. of Envtl. Conservation, 161 AD3d at 20-21 [internal quotation marks and citations omitted]), the APA's determination to not hold an adjudicatory hearing was neither irrational nor arbitrary and capricious (see Matter of Adirondack White Lake Assn. v Adirondack Park Agency, 225 AD3d at 1248; Matter of Riverkeeper, Inc. v New York State Dept. of Envtl. Conservation, 152 AD3d at 1018). Accordingly, although there may have been another [*10]rational result, Supreme Court also erred by substituting its judgment for that of the APA relating to whether to hold an adjudicatory hearing (see Matter of Riverkeeper, Inc. v New York State Dept. of Envtl. Conservation, 152 AD3d at 1018).
Lastly, petitioners contend, and Supreme Court found, that the actions of the APA were affected by errors of law and were arbitrary and capricious because the APA staff presentation was inaccurate, one-sided and contained a misrepresentation of the time constraints imposed on the APA board. However, as Supreme Court had initially and correctly recognized, there are no requirements governing an APA staff presentation and whether it must be balanced, and therefore it was an error for Supreme Court to then create and impose such a standard upon the APA. Rather, "[i]n evaluating whether an administrative determination is informed, courts accord the determination a presumption of regularity and will not disturb it absent a clear revelation that the administrative body made no independent appraisal and reached no independent conclusion" (Matter of Bruso v Clinton County, 139 AD3d 1169, 1171 [3d Dept 2016] [internal quotation marks and citations omitted]). Here, based on the record before us — particularly the recorded public meeting wherein APA board members made statements partially explaining the reasoning for their vote — we are satisfied that "there is no indication in the record that the APA failed to make an informed decision based upon an independent appraisal of the evidence" (Adirondack White Lake Assn. v Adirondack Park Agency, 225 AD3d at 1248 [internal quotation marks and citation omitted]). Nor does the record support the finding that the APA misrepresented the time constraints on the applications, as APA staff and counsel present at the public meeting correctly represented that the APA may not deny a permit application without holding an adjudicatory hearing and that the decision whether to hold such a hearing must be within 60 days of deeming the permit applications complete (see Executive Law § 809 [3] [d]). Since the permit applications were deemed complete on March 3, 2022 and the public meeting on April 14, 2022 was the last meeting before the 60 days lapsed, the APA complied with its regulatory obligations. We further reject petitioners' remaining contentions as they relate to other perceived improprieties during the application process and APA staff presentation (see generally Matter of Protect the Adirondacks! Inc. v Adirondack Park Agency, 121 AD3d at 78). Therefore, Supreme Court should have dismissed the petition in its entirety, and we make the appropriate entry. We have considered the remaining contentions of the parties and have found them to be either without merit or academic.
Egan Jr., J.P., Aarons and Pritzker, JJ., concur.
ORDERED that the motion is denied, without costs.
ORDERED that the judgment is reversed, on the law, without costs, and petition dismissed.

Footnotes

Footnote 1: Freshwater wetlands are characterized and assigned one of four value ratings — specifically, one, two, three or four, with one being the highest value — based on specific characteristics that indicate the overall worth of a given wetland (see 9 NYCRR 578.5; see also Matter of Jorling v Adirondack Park Agency, 214 AD3d 98, 103 [3d Dept 2023]). Such rating is relevant to the issuance of permits, as the proposed activity to occur in a wetland is measured differently between each value (see generally 9 NYCRR 578.10 [a]).

Footnote 2: Although it came to the APA's attention that a large number of comments had been unwittingly filtered into the APA's spam email folder, such diverted comments were reviewed by the APA staff prior to the meeting, included in the meeting packet and posted to the public website.

Footnote 3: Prior to Supreme Court's decision and judgment, petitioners withdrew three causes of action asserted against DEC.

Footnote 4: It is further necessary to acknowledge that the prior determinations by the APA whether to hold an adjudicatory hearing over the last decade are nonbinding on this Court and, therefore, neither parties' challenged statements in the context of this motion have any bearing on the matter before us — particularly inasmuch as they are not in the record before either the APA board or this Court.

Footnote 5: Petitioners have placed great emphasis as to the handling of these two submissions. Initially, having been sent within two days of the meeting and almost two weeks after the public comment period officially closed, they were late — notwithstanding the gratuitous offer of an APA staff member advising that comments would continue to be accepted until the meeting. To the extent that petitioners further highlight an email from the executive director of the LGPC calling for the rejection of such late submissions, while provocative, such email was not from the APA or binding on the APA and, nevertheless, it is not disputed that the APA staff ultimately did email such submissions to the APA board. To that point, as petitioners' counsel acknowledged at oral argument and our review of the record confirms, such additional submissions were almost entirely redundant of the original submissions that had already been forwarded to the APA and were otherwise included in the meeting packet.

Footnote 6:Staff compared hand harvesting EWM in Lake George to handpicking dandelions on a large golf course — but with the added difficulty of it being underwater.

Footnote 7: Florpyrauxifen-benzyl is the active ingredient in ProcellaCOR.

Footnote 8: The EPA specifically assessed a variety of exposure information, including through the use of environmental fate studies and toxicity studies of florpyrauxifen-benzyl and its metabolites.

Footnote 9: The classification as "practically non-toxic" is the lowest level assigned by the EPA.

Footnote 10: Specifically, chronic testing conducted and reviewed by the EPA indicated toxicity to the freshwater midge (aquatic insect) and the mysid (opossum shrimp). Further studies by DEC of florpyrauxifen-benzyl and its metabolites revealed delayed emergence of male freshwater midges exposed to metabolite hydroxy-acid, confirming chronic toxicity, but ultimately concluding there was only a low toxicity risk to freshwater aquatic invertebrates.

Footnote 11: In the year following the application of ProcellaCOR, only a single EWM plant was found in the entire lake.

Footnote 12: It is noted that the same APA board member who stated she did not have enough information had asked earlier in the presentation whether the board would receive a copy of the Minerva Lake project, at which time staff advised that it was included in the meeting packet, therefore suggesting that — although she wanted more information — she had also not completely reviewed all of the information already provided to the board.

Footnote 13: The limnologist challenged the use of ProcellaCOR SC in her submissions, which is a different product, concentration and EPA registration from the proposed treatment using ProcellaCOR EC. It is unclear in the record whether her contentions and analysis referred to the correct herbicide.